1
2
3
4
5
6
7
8          UNITED STATES DISTRICT COURT

9          EASTERN DISTRICT OF CALIFORNIA

10

11   KELLY ALICE KESSLER, also known as        No.  1:10-cv-00322-LJO-BAM  HC
     KELLY ALICE ARMSTRONG,
12                                             **FINDINGS AND RECOMMENDATIONS**
                      Petitioner,              **RECOMMENDING  DENIAL OF**
13                                             **PETITION FOR WRIT OF HABEAS**
           v.                                  **CORPUS**
14
     DEBORAH K. JOHNSON, Warden, and
15   JEFFREY BEARD, Ph.D., Secretary,
     California Department of Corrections and
16   Rehabilitation,
                                               **(Docs. 24 and 35)**
17                    Respondents.

18

19          Petitioner, a state prisoner represented by counsel, proceeds with a petition for writ of

20   habeas corpus pursuant to 28 U.S.C. § 2254.  In February 2003, a jury convicted Petitioner of

21   (1) felony possession of a firearm with prior conviction (Cal. Penal Code § 12021.1);

22   (2) exhibiting a firearm (Cal. Penal Code § 417(a)(2)); (3) petty theft (Cal. Penal Code § 484(a));

23   and (4) aggravated trespass (Cal. Penal Code § 602.5(b)).  In May 2003, the Tuolumne County

24   Superior Court applied California's three strikes law (Cal. Penal Code § 667) and sentenced

25   Petitioner to an aggregate prison term of 26 years to life.  Petitioner claims as grounds for habeas

26   relief (1) ineffective assistance of counsel contrary to the Sixth Amendment arising from trial

27   counsel's failure (a) to investigate a prior Nevada burglary conviction which the state court

28

1

counted as a strike and (b) to advise her of her right to bifurcate her prior convictions from the case in chief; (2) due process violations of the Fifth and Fourteenth Amendments arising from the prosecution's misrepresentation that legally cognizable evidence supported the conclusion that the prior Nevada burglary conviction constituted a strike under California law; (3) due process violations of the Fifth and Fourteenth Amendments arising from the prosecution's failure to disclose impeaching information concerning the victim's health and eyesight; and (4) due process violations of the Fifth and Fourteenth Amendments arising from the State's determination that the prior Nevada burglary conviction was a strike.

## I.    **Factual Background**

The California Court of Appeal found the following facts in Petitioner's direct appeal of her conviction:

> About five months prior to November 2001, [Petitioner] and Dorrey Hite drove from Tuolumne to Modesto and made a heroin purchase at a house in Modesto. Sometime later, Hite returned to the Modesto house without [Petitioner] and made another heroin purchase.
>
> On November 18, 2001, at about 2:30 a.m., [Petitioner] and Kevin Wallen arrived at Hite's Tuolumne apartment and kicked the door in.[1] [Petitioner] had a big black gun. She swung the gun around, pointed it at Hite's face, and said at least three times "I'm going to shoot you!" [Petitioner] said that Hite had gone to [Petitioner's] "connection's house," and said something about losing $20 in a drug deal. Hite ran out the back door of her apartment, yelled "she's got a gun" and yelled for her neighbors to call the police. [Petitioner] followed Hite to the back steps of the nearby apartment of her neighbor, John Castro. Castro came out, saw Hite struggling with [Petitioner], and broke the two women apart. Vickie Paul, a friend of Castro's wife and a guest in Castro's apartment, came out and went into Hite's apartment. Paul saw Wallen at Hite's front door, and heard Wallen say to [Petitioner] "Let's go." [Petitioner] left by reentering the back door of Hite's apartment, walking through the apartment, and then exiting through the front door. While walking through, [Petitioner] took Hite's cellular telephone. Very shortly thereafter, [Petitioner] approached Hite's front door again, this time

---

[1] Wallen pleaded guilty to the charges against him arising from the November 18, 2001, incident. He did not testify at Petitioner's trial. According to the investigator assisting in the preparation of Petitioner's postconviction actions, Wallen would not speak with him concerning the incident.

2

carrying an open Buck knife.  The police arrived, and [Petitioner] dropped the knife and walked to the police vehicle.

Police found the gun and Hite's cellular telephone in the Ford Bronco [Petitioner] and Wallen had driven to Hite's apartment.  Wallen was sitting in the parked Ford Bronco when police arrived at the scene.  Police found the open knife with its blade stuck in the ground near Hite's front door.  The knife had the initials "K.W." etched on the blade.

*People v. Kessler*, 2004 WL 1067965 at *1-2 (Cal. App. May 13, 2004) (No. F043033).

## II.    Procedural Background

On or about December 21, 2001, the Tuolumne County District Attorney charged Petitioner with the following crimes: (1) felony possession of a firearm with prior conviction (Cal. Penal Code § 12021.1); (2) exhibiting a firearm (Cal. Penal Code § 417(a)(2)); (3) petty theft (Cal. Penal Code § 484(a)); and (4) aggravated trespass (Cal. Penal Code § 602.5(b)).  The complaint alleged prior felony convictions of robbery (Cal. Penal Code § 212.5(b)) and receiving stolen property (Cal. Penal Code § 496(a)) in San Francisco, California (December 1, 1994), and burglary (Nev. Rev. Stats. §  205.060) in Carson City, Nevada (August 1, 1995).  On February 28, 2003, following a three-day trial, the jury convicted Petitioner on all counts.  On May 5, 2003, the court sentenced Petitioner to an aggregate prison term of 26 years to life.

Petitioner filed a direct appeal on May 8, 2003.  She contended that (1) her prior burglary conviction in Nevada did not constitute a strike under California law, and (2) the trial court erred in failing to instruct the jury on voluntary intoxication.  The Court of Appeals affirmed the conviction on May 13, 2004, and denied Petitioner's petition for rehearing on June 3, 2004.  The California Supreme Court denied review on July 28, 2004.

On February 28, 2005, Petitioner filed a petition for writ of habeas corpus in Tuolumne County Superior Court in which she contended that:

(1) The prosecution violated Petitioner's right to due process by suppressing material exculpatory evidence concerning Dorrey Jean Hite's lack of capacity to perceive the events about which she testified at trial;

(2) The prosecution violated Petitioner's right to due process of law by representing to the Tuolumne Superior Court that there was legally-cognizable evidence that Petitioner had been convicted of first degree burglary in the State of Nevada when in fact the public record of that conviction contains no such evidence; and

(3) Petitioner was denied her Sixth Amendment right to effective assistance of counsel.

*See* Doc. 7 at 38-39.

The Superior Court denied the petition on March 16, 2005.

On April 11, 2005, Petitioner filed a writ of habeas corpus in the California Court of Appeal. The Court of Appeal found that Petitioner's claims were based on speculation and unsworn testimony. On June 28, 2006, the Court of Appeal denied the petition and directed Petitioner to file an amended petition in Superior Court, including more complete declarations or explaining why such declarations are unavailable.

On October 23, 2006, Petitioner filed an amended petition for writ of habeas corpus in Tuolumne County Superior Court, alleging the original three claims plus two more:

(IV) The Tuolumne County Superior Court erred in denying habeas corpus relief on the grounds that (A) Petitioner's first claim does not make a prima facie showing of grounds for relief under *Brady v. Maryland*, and (B) Petitioner's second and third claims were, or could have been, raised on appeal.

(V) All issues referenced in the Court of Appeal's June 28, 2006 order have been fully addressed in the instant petition.

*See* Doc. 9 at 4-5.

Finding that Petitioner's claims were still speculative and lacked factual support, the Superior Court denied the amended petition on December 29, 2006.

On January 16, 2007, Petitioner again filed a petition for writ of habeas corpus in the California Court of Appeal. On January 25 and April 4, 2007, the Court of Appeal asked Petitioner's trial attorney, Richard E. Hove, to file a declaration responding to Petitioner's claims

///

4

of ineffective assistance of counsel.  Mr. Hove did not respond.  On August 15, 2008, the Court of Appeal denied the petition without prejudice.

On September 12, 2008, Petitioner filed a third petition for writ of habeas corpus in the Tuolumne County Superior Court.  She alleged the previous five claims plus two more:

> (VI)   The Tuolumne County Superior Court erred in denying Petitioner's amended petition for writ of habeas corpus.
>
> (VII)   All issues referenced in the Court of Appeal's August 15, 2008 order have been fully addressed in the instant petition.

*See* Doc. 10-1 at 5-6.

The Superior Court denied the petition on December 12, 2008.

Petitioner filed a petition in the Court of Appeals on January 6, 2009.  On October 30, 2009, the Court of Appeals found that Petitioner had made a prima facie case for habeas relief on two issues: (1) the suppression of probation records relevant to the eyesight of witness Dorrey Hite and (2) ineffective assistance of trial counsel regarding Petitioner's prior burglary conviction in Nevada.  (These two issues comprise federal claims one and three.)  The appellate court ordered the Tuolumne County Superior Court to show cause why Petitioner was not entitled to habeas relief.  On November 13, 2009, the Superior Court ordered the California Department of Corrections and Rehabilitation to show cause why the petition should not be granted.

On December 1, 2009, Petitioner petitioned the California Supreme Court for review of the issue for which the Court of Appeals did not find Petitioner had made a prima facie showing: whether the prosecuting attorney expressly represented to the trial court, and by extension the Court of Appeal and the California Supreme Court, that he possessed evidence that Petitioner had previously incurred a burglary conviction that qualified as a strike when no such evidence existed. (This issue is claim two in Petitioner's federal habeas petition.)  The California Supreme Court denied the petition for review on February 18, 2010.

On February 23, 2010, Petitioner filed a federal petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  On October 22, 2010, the Court stayed the petition on Petitioner's motion to permit her exhaustion of federal claims one and three, then pending in the Tuolumne Superior Court.

5

On May 20, 2010, the Superior Court denied the habeas petition for the fourth and final time.  On June 11, 2010, Petitioner filed a petition in the Court of Appeals, which denied it on August 20, 2010.  Petitioner filed a petition for review with the California Supreme Court on August 30, 2010.  The California Supreme Court denied review on October 27, 2010.  All of Petitioner's federal habeas claims were then exhausted.

On January 18, 2011, this Court lifted the stay, and Petitioner filed the first amended complaint.

On April 5, 2011, Petitioner moved for an evidentiary hearing to address the following issues:

> 1.     Whether trial counsel rendered ineffective assistance in failing to investigate the Nevada prior conviction and in advising Petitioner to admit said conviction under circumstances where said prior does not constitute a "strike" conviction;
>
> 2.     Whether trial counsel's failure to advise Petitioner of her right to bifurcate the prior burglary conviction from the trial of the charged counts was ineffective assistance of counsel;
>
> 3.     Whether the prosecution misrepresented to the trial court that it possessed evidence that Petitioner suffered a prior conviction in the state of Nevada that qualified as a conviction for "burglary of the first degree" under California law; and
>
> 4.     Whether the prosecutor's failure to disclose material, exculpatory, impeaching facts concerning key prosecution witness Dorrey Hite's ability to perceive constituted a *Brady* violation compelling reversal.
>
> Doc. 35 at 7.

## III.     Constitutionality of the AEDPA

Petitioner contends that the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") is unconstitutional because (1) it violates the suspension clause set forth in art. I, § 9 of the U.S. Constitution, and (2) 28 U.S.C. § 2254(d)(1) represents a congressional incursion into judicial powers that violates the separation of powers provisions of articles I, II, and III.  The AEDPA's constitutionality is a settled question of law.  As a result, Petitioner's constitutional challenge lacks merit.

///

**A.**     **Violation of Suspension Clause**

"The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2.  After proposing that resolution of the constitutional challenges abide the Court's addressing the substantive issues, the petition itself did no more than contend that the AEDPA as a whole offends the suspension clause.  In her supplemental briefing, Respondent contends that the suspension clause does not apply to state prisoners.  In her two-paragraph supplemental reply (*see* Doc. 49 at 5), Petitioner repeats her position that the Court need not address her constitutional challenge to the AEDPA if it resolves the case on another substantive issue.  Thus, Petitioner has presented the constitutional challenge but never articulated her reasoning nor set forth precedent supporting her position.

Although the suspension clause is appropriately evaluated in consideration of currently applicable law, consideration of the historical availability of habeas relief provides context for analyzing its application to state prisoners:

> The writ of habeas corpus known to the Framers was quite different from that which exists today.  As we explained previously, the first Congress made the writ of habeas corpus available only to prisoners confined under the authority of the United States, not under state authority.  *Supra*, at 659; see *Ex parte Dorr*, 3 How. 103, 11 L.Ed. 514 (1845).  The class of judicial actions reviewable by the writ was more restricted as well.  In *Ex parte Watkins*, 3 Pet. 193, 7 L.Ed. 650 (1830), we denied a petition for a writ of habeas corpus from a prisoner "detained in prison by virtue of the judgment of a court, which court possesses general and final jurisdiction in criminal cases." *Id.* at 202.  Reviewing the English common law which informed American courts' understanding of the scope of the writ, we held that "[t]he judgment of the circuit court in a criminal case is of itself evidence of its own legality," and that we could not "usurp that power by the instrumentality of the writ of habeas corpus." *Id.* at 207.
>
> It was not until 1867 that Congress made the writ generally available in "all cases where any person may be restrained of his or her liberty in violation of the constitution, or of any treaty or law of the United States." *Supra*, at 659.  And it was not until well into this century that the Court interpreted the provision to allow a final judgment of conviction in a state court to be collaterally attacked on habeas.  See, e.g., *Waley v. Johnston*, 316 U.S. 443 . . . (1942) (*per curiam*); *Brown v. Allen*, 344 U.S. 443 . . . (1953).
>
> *Felker v. Turpin*, 518 U.S. 651, 663-64 (1996).

7

1       Evaluating the 1996 changes in the law applicable to second or successive petitions, the

2   Supreme Court observed that although the AEDPA affected the standards for granting habeas

3   relief, it did not preclude federal courts from considering state prisoners' petitions for habeas

4   relief.  *Id.* at 654.

5       Relying on *Felker* in its analysis of a Suspension Clause challenge to § 2254(d)(1), the

6   Seventh Circuit opined, "[T]o alter the standards on which writs issue is not to 'suspend' the

7   privilege of the writ." *Lindh v. Murphy*, 96 F.3d 856, 867 (7th Cir. 1996) (*en banc*), *rev'd on other*

8   *grounds*, 521 U.S. 320 (1997).  The Fourth Circuit also rejected a suspension clause challenge,

9   again reasoning that the amendment of §2254(d)(1) altered the standards for evaluating habeas

10  writs brought by state prisoners but did not suspend the writ.  *Green v. Finch*, 143 F.3d 865, 875

11  (4th Cir. 1998), *abrogated on other grounds, Williams (Terry) v. Taylor*, 529 U.S. 362 (2000).

12  The Ninth Circuit agreed with the Seventh and Fourth Circuits, concluding that "the operative

13  provisions of the [AEDPA] do not violate the Suspension Clause," because "Section 2254(d)(1)

14  simply modifies the preconditions for habeas relief, and does not remove all habeas jurisdiction."

15  *Crater v. Galaza*, 491 F.3d 1119, 1125, 1126 (9th Cir. 2007).  *See also Evans v. Thompson*, 518

16  F.3d 1, 9-10 (1st Cir. 2008).

17      **B.**    **Separation of Powers**

18      The AEDPA does not violate the separation of powers doctrine.  *Crater*, 491 F.3d at

19  1126-30.  *See also Cobb v. Thaler*, 682 F.3d 364, 374 (5th Cir. 2012).  Although Articles I, II, and

20  III of the Constitution divide authority among the executive, legislative and judicial branches of

21  the federal government, the Constitution does not contemplate that each branch of government

22  will function in complete isolation.  Contrary to Petitioner's arguments, the Constitution allocates

23  to Congress the responsibility to enact provisions that check and balance judicial power.  "The

24  judicial power of the United States, shall be vested in one Supreme Court, and in such inferior

25  courts as Congress may from time to time ordain and establish."  U.S. Const. art. III, § 1, cl. 1.

26  Congress initially authorized the courts to issue writs of habeas corpus in the Judiciary Act of

27  1789.  *Immigration and Naturalization Service v. St. Cyr*, 533 U.S. 289, 305 (2001).  As

28  discussed above, the scope and application of federal habeas laws have been amended throughout

1    our history by both judicial decision and congressional amendment.  Indeed, Congress enacted

2    habeas statutes both before and after the 1996 amendments that constituted the AEDPA.

3        **C.    Conclusion**

4        The constitutionality of the AEDPA is a settled question.  Accordingly, Petitioner's

5    contention that the AEDPA is unconstitutional cannot prevail before this Court.

6    **IV.    Standard of Review**

7        **A.    In General**

8        A person in custody as a result of the judgment of a state court may secure relief through a

9    petition for habeas corpus if the custody violates the Constitution or laws or treaties of the United

10   States.  28 U.S.C. § 2254(a); *Williams (Terry)*, 529 U.S. at 375.  On April 24, 1996, Congress

11   enacted the AEDPA, which applies to all petitions for writ of habeas corpus filed thereafter.

12   *Lindh*, 521 U.S. at 322-23.  Under the statutory terms, the petition in this case is governed by the

13   AEDPA's provisions because Petitioner filed it after April 24, 1996.

14       Nonetheless, in each of her three claims, Petitioner contends that the AEDPA does not

15   apply to her petition, arguing that the Court of Appeal "failed to consider evidence which it

16   should have considered in addressing this constitutional claim."  *See* Doc. 22-1 at 81, 103, 124

17   (citing *Williams (Terry)*, 529 U.S. 413-14).  The argument is without merit because Petitioner

18   invokes the AEDPA standard of review when it suits her, and merely seeks to relitigate her claims

19   before this Court without having to establish the exceptions set forth in §§ 2254(d)(1) and (d)(2).

20   *See Harrington v. Richter*, 562 U.S. 86, 98 (2011).

21       "Federal courts are not forums in which to relitigate state trials."  *Brecht v. Abrahamson*,

22   507 U.S. 619, 620 (1993).  "By its terms, § 2254(d) bars relitigation of any claim 'adjudicated on

23   the merits' in state court, subject only to the exceptions set forth in §§ 2254(d)(1) and (d)(2)."

24   *Harrington*, 562 U.S. at 98.  Habeas corpus is neither a substitute for a direct appeal nor a device

25   for federal review of the merits of a guilty verdict rendered in state court.  *Jackson v. Virginia*,

26   443 U.S. 307, 332 n. 5 (1979) (Stevens, J., concurring).

27   ///

28   ///

Habeas corpus relief is intended to address only "extreme malfunctions" in state criminal justice proceedings. *Id.* Under the AEDPA, a petitioner can prevail only if she can show that the state court's adjudication of her claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.
>
> 28 U.S.C. § 2254(d); *Lockyer v. Andrade*, 538 U.S. 63, 70-71 (2003); *Williams (Terry)*, 529 U.S. at 413.

Section 2254(d) sets forth a "'highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt.'" *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002)). The federal court must apply the presumption that state courts know and follow the law. *Visciotti*, 537 U.S. at 24.

The AEDPA standard is difficult to satisfy since even a strong case for relief does not demonstrate that the state court's determination was unreasonable. *Harrington*, 562 U.S. at 102. "A federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Lockyer*, 538 U.S. at 75-76. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

**B.**     **Burden of Proof**

The petitioner has the burden of establishing that the decision of the state court is contrary to, or involved an unreasonable application of, United States Supreme Court precedent. *Baylor v. Estelle*, 94 F.3d 1321, 1325 (9th Cir. 1996). He or she is required to demonstrate "that the state court's ruling on the claim being presented in federal court was so lacking in justification that

///

10

1  there was an error well understood and comprehended in existing law beyond any possibility for

2  fairminded disagreement." *Harrington*, 562 U.S. at 103.

3     **C.      Legal Determinations**

4     "Section 2254(d)(1) does not instruct courts to discern or to deny a constitutional

5  violation.  Instead, it simply sets additional standards for granting relief in cases where a

6  petitioner has already received an adjudication of his federal claims by another court of

7  competent jurisdiction." *Crater*, 491 F.3d at 1127.

8     In analyzing a habeas petition under the AEDPA, a federal court must first determine what

9  constitutes "clearly established Federal law, as determined by the Supreme Court of the United

10 States." *Lockyer*, 538 U.S. at 71.  "Clearly established . . . as determined by" the Supreme Court

11 "refers to the holdings, as opposed to the dicta, of th[at] Court's decisions at the time of the

12 relevant state court decision." *Williams (Terry)*, 529 U.S. at 412.

13    To analyze the state court's adjudication of legal claims, the District Court must look to

14 the holdings, as opposed to the dicta, of the U.S. Supreme Court's decisions at the time of the

15 relevant state-court decision.  *Id.*  The court must then consider whether the state court's decision

16 was "contrary to, or involved an unreasonable application of, clearly established Federal law." *Id.*

17 at 72.  The Supreme Court must have applied the rule in the context in which the petitioner's

18 claim is made, however.  *Premo v. Moore*, 562 U.S. 115, 128 (2011); *Carey v. Musladin*, 549

19 U.S. 70, 75-76 (2006).  The state court need not have cited clearly established Supreme Court

20 precedent; it is sufficient that neither the reasoning nor the result of the state court contradicts it.

21 *Early v. Packer*, 537 U.S. 3, 8 (2002).

22    "Under § 2254(d), a habeas court must determine what arguments or theories supported,

23 . . . or could have supported, the state court's decision; and then it must ask whether it is possible

24 fairminded jurists could disagree that those arguments or theories are inconsistent with the

25 holding in a prior decision of the Court." *Harrington*, 562 U.S. at 102.  That is the only question

26 that matters under § 2254(d)(1)." *Id.*

27 ///

28 ///

11

### D.  Factual and Mixed Determinations

When a federal court is presented with a state court's factual determinations and matters of mixed law resting on findings of fact, the "AEDPA plainly sought to ensure a level of 'deference to the determinations of state courts,' provided those determinations did not conflict with federal law or apply federal law in an unreasonable way.  H.R. Conf. Rep. No. 104-518, p. 111 (1996).  Congress wished to curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law.  When federal courts are able to fulfill these goals within the bounds of the law, the AEDPA instructs them to do so."  *Williams (Terry)*, 529 U.S. at 386.

A petitioner cannot evade the District Court's deference to the state courts by an attempt to relitigate the facts, such as by resort to § 2254(e) to test whether the state court's factual conclusions were "correct."  To the extent that a petitioner might debate whether new evidence might show that the state court's fact finding was *correct*, the federal court must remember that the § 2254(d) bar is completely independent of correctness.  The only relevant factual or legal question under § 2254(d) is whether the state court's determination was *reasonable*.  In the context of fact finding, then, the only question is whether the state court reasonably determined the facts in light of the record.  *Harrington*, 562 U.S. at 100.

### E.  Applicability of the AEDPA

Petitioner repeatedly claims that the AEDPA does not apply to her case because the state court failed to consider evidence which it should have considered in addressing her constitutional claims.  The argument is without merit both in (1) its inartful assertion that the AEDPA "does not apply," and (2) its misinterpretation of the cited portion of *Williams (Terry)*.

#### 1.  Inartful Language

Petitioner's repeated insistence that the AEDPA "does not apply" "due to the [state courts'] failure to consider evidence which should have been considered" in addressing her constitutional claims has no precedential basis, despite her citation to *Williams (Terry)*.  By its own terms, the AEDPA applies to all habeas cases filed after April 24, 1996, including the petition in this case.  Were Petitioner proceeding *pro se*, the Court would be inclined to attribute

12

1    the peculiar terminology to a lack of legal knowledge and experience.  Petitioner is represented

2    by counsel, however, who may reasonably be expected to express legal arguments precisely and

3    accurately using appropriate legal terms.  Accordingly, the Court will analyze the contention

4    using Petitioner's peculiar terminology.

5         **2.**      ***Williams v. Taylor***

6         As previously stated, Petitioner bases her contention on *Williams (Terry)*, 529 U.S. at 397-

7    98, 413-16.  The Court does not read *Williams(Terry)* as argued by Petitioner.  As discussed in

8    detail below, the Supreme Court did *not* hold that AEDPA is inapplicable if the state courts failed

9    to consider relevant evidence.

10        **a.  Overview of lower Court decisions in *Williams (Terry)***

11        Terry Williams was sentenced to death for a murder that officials had categorized as a

12   "natural" death until Williams turned himself in for killing the victim.  *Id.* at 369-370.  Following

13   his conviction and sentencing, Williams contended that his Sixth Amendment right to counsel

14   was violated by ineffective assistance of his trial counsel, who had failed to discover and present

15   significant mitigating evidence in the sentencing phase of his capital trial.

16        In state collateral proceedings, the Danville (Va.) Circuit Court, in which Williams had

17   been tried, upheld the conviction but concluded that trial counsel had been ineffective during

18   sentencing for failing to present mitigating evidence.  *Id.* at 370.  The Virginia Supreme Court

19   rejected the Circuit Court's conclusion, but assuming that trial counsel had been ineffective,

20   concluded that counsel's ineffective assistance had not resulted in sufficient prejudice to warrant

21   habeas relief.  *Id.* at 371-72.

22        After exhausting state remedies, Williams filed a habeas petition pursuant to 28 U.S.C.

23   § 2254.  *Id.* at 372.  "Noting that the Virginia Supreme Court had not addressed the question

24   whether trial counsel's performance at the sentencing hearing fell below the range of competence

25   demanded of lawyers in criminal cases," the District Court identified five categories of mitigating

26   evidence that trial counsel had failed to introduce and rejected the argument that trial counsel

27   tactically decided not to investigate mitigating evidence in favor of relying on Williams'

28   voluntary confession.  *Id.* at 372-73.  Even if counsel's failure to investigate had been a tactical

decision, the court found such a tactical decision did not constitute reasonable performance of counsel. *Id.* at 373. It then found a reasonable probability that the outcome of the proceeding would have been different but for trial counsel's unprofessional errors. *Id.* Thus, the District Court concluded that "the Virginia Supreme Court's decision 'was contrary to, or involved an unreasonable application of clearly established Federal law' within the meaning of § 2254(d)(1)." *Id.* at 374.

On appeal from the District Court's grant of habeas relief, the Fourth Circuit Court of Appeals reversed, construing § 2254(d)(1) as prohibiting habeas relief unless the state court "decided the question by interpreting or applying the relevant precedent in a manner that reasonable jurists would all agree is unreasonable." *Id.* (internal quotation marks omitted). Applying that standard, the Court of Appeals concluded that the Virginia Supreme Court's decision of the prejudice issue was not an unreasonable application of the tests set forth in *Strickland* and *Lockhart*, and found reasonable the Virginia Supreme Court's determination that evidence of Williams' future danger to society was "overwhelming." *Id.*

### b. Supreme Court's Standards

The U.S. Supreme Court granted certiorari and reversed. The Court's decision is composed of Parts I, III, and IV of the opinion written by Justice Stevens, and Part II of the opinion written by Justice O'Connor. Part II considered the proper analysis to be applied in evaluating § 2254(d)(1), as revised by the AEDPA. *Id.* at 399.

As noted by the Supreme Court, before Congress enacted the AEDPA, a federal habeas court owed no deference to a state court's resolution of questions of constitutional law or mixed constitutional questions, defined as the application of constitutional law to fact. *Id.* at 400. Instead, federal habeas courts exercised independent judgment in deciding such questions. *Id.* The AEDPA amended the standard of review. *Id.* With regard to all federal habeas petitions filed by state prisoners after the AEDPA's effective date (April 24, 1996), Section 2254(d)(1) permits a federal court to grant a state prisoner habeas relief in two instances: when the state-court decision was (1) contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States, or (2) involved an unreasonable application of . . . clearly

14

1   established Federal law, as determined by the Supreme Court of the United States. *Id.* at 404-05.

2       A state court decision is contrary to clearly established federal law if it is "substantially

3   different from the relevant precedent of [the United States Supreme C]ourt." *Id*. at 405. "A state

4   court decision will also be contrary to [the United States Supreme C]ourt's clearly established

5   precedent if the state court confronts a set of facts that are materially indistinguishable from a

6   decision of th[e Supreme] Court and nevertheless arrives at a result different from [its]

7   precedent." *Id.* at 406.

8       A state court may unreasonably apply the Supreme Court's clearly established precedent

9   by (1) identifying the correct governing rule from the Court's cases but unreasonably applying it

10  to the facts of the case before it, or (2) unreasonably extending a legal principle from Supreme

11  Court precedent to a new context in which it should not apply or unreasonably refusing to extend

12  the principle to a new context in which it should apply. *Id.* at 407. Whether a legal principle is

13  inappropriately extended or withheld in a new context presents a difficult distinction that the

14  *Williams* Court chose not to address. *Id.* at 408-09. In any event, a court must objectively

15  determine whether the state court's application of clearly established federal law was

16  unreasonable. *Id.* at 409.

17      An unreasonable application of clearly established federal law is different from its

18  incorrect application. *Id.* at 410. "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a

19  federal habeas court may not issue the writ simply because that court concludes in its independent

20  judgment that the relevant state-court decision applied clearly established federal law erroneously

21  or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

22          **c.    Clearly Established Law under *Strickland*-Failure to Present Evidence**

23      Part III of the *Williams (Terry)* opinion (written by Justice Stevens) then identified clearly

24  established federal law concerning ineffective assistance of counsel, the standard articulated in

25  *Strickland*, and examined its application to the facts of the *Williams (Terry)* case. At pages 397-

26  98, included within Part IV of the Court's decision and specifically cited as supporting

27  Petitioner's claim that the AEDPA does not apply to her petition, the Court examined whether the

28  deficient assistance of Williams' trial counsel prejudiced Williams within the meaning of

15

*Strickland*. In doing so, the Court necessarily evaluated the likely effect of the mitigating evidence which Williams contended that his trial counsel had failed to investigate and present, as well as the evidence presented in the penalty phase of Williams' trial. Including analysis of the evidence that Williams first presented in his collateral proceedings was essential to the Supreme Court's determining whether the Virginia courts reasonably applied clearly established federal law.

Like the Court did in *Williams(Terry),* a federal district court considering a habeas petition may need to evaluate the nature or extent of the state court's factual findings in the context of analyzing whether a state court decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. But the *William (Terry)* decision held neither that state courts must consider all evidence that a petitioner wishes to produce in collateral proceedings nor that a state court's failure to consider all evidence that a petitioner claims to be relevant to the clearly established federal law renders the AEDPA inapplicable.[2]

Having carefully reviewed the *Williams(Terry)* decision in its entirety, this Court rejects Petitioner's assertion that the AEDPA does not apply when the state courts failed to consider evidence that they should have considered. In short, the AEDPA applies to this petition.

## VI.   Request for Further Discovery and Evidentiary Hearing

Petitioner contends that she was "denied full factual development of her claims through discovery, full access to the Tuolumne Superior Court, California Court of Appeal and California Supreme Court and those courts' subpoena powers; additionally, Petitioner has not been granted evidentiary hearings on any of her claims during post-conviction proceedings in state court." Doc. 22-1 at 15. As a result, "full evidence in support of the claims [set forth in the petition] is not currently available despite Petitioner's diligence in investigating and presenting her claims." *Id.* Petitioner adds that she may have further claims once she is allowed to investigate fully all potentially applicable evidence. *Id.*

---

[2] Interestingly, although Petitioner cites 28 U.S.C. § 2254(d)(*2*) in arguing that the AEDPA does not apply to her petition, *Williams (Terry)* addressed the application of 28 U.S.C. § 2254(d)(*1*) to the petitioner's claim of ineffective assistance of trial counsel.

1    "Habeas is an important safeguard whose goal is to correct real and obvious wrongs.  It

2    was never meant to be a fishing expedition for habeas petitioners to 'explore their case in search

3    of its existence.'"  *Rich v. Calderon*, 187 F.3d 1064, 1067 (9th Cir. 1999) (quoting *Calderon v.*

4    *United States District Court for the Northern District of California (Nicolaus)*, 98 F.3d 1102,

5    1106 (9th Cir. 1996)).  Habeas petitioners are not routinely entitled to discovery.  *Bracy v.*

6    *Gramley*, 520 U.S. 899, 904 (1997).  The discovery provisions of the Federal Rules of Civil

7    Procedure do not generally apply in habeas cases.  *Harris v. Nelson*, 394 U.S. 286, 295 (1969).

8    *See* Rule 6(a) of the *Rules Governing §2254 Cases* ("A judge may, for good cause, authorize a

9    party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of

10   discovery").

11        Section 2254(e)(1) of AEDPA bars most evidentiary hearings if the applicant "failed" to

12   develop the factual basis for the claim in state court. In this context, "failed" "connotes some

13   omission, fault, or negligence on the part of the person who has failed to do something."

14   *Williams(Terry)*, 529 U.S. at 431–32. "Under §2254(e)(2), a petitioner who failed to develop the

15   facts of the claim in state court may not obtain a hearing in federal court except in limited

16   circumstances."  *See, e.g., Atwood v. Schriro*, 489 F.Supp.2d 982, 1007 (D.Ariz. 2007).  If the

17   court determines that the applicant failed to develop the factual basis for a claim in state court, the

18   district court can hold an evidentiary hearing only if the petitioner meets two demanding

19   requirements: (1) the allegations, if proven, would entitle to petitioner to relief and (2) the state

20   court trier of fact has not reliably found the relevant facts.  *Rich*, 187 F.3d at 1068.   A habeas

21   petitioner who has failed to develop a factual basis for his claims in state court and requests an

22   evidentiary hearing before a federal district court must demonstrate that "the claim relies on . . . a

23   factual predicate that could not have been previously discovered through the exercise of due

24   diligence and . . . the facts underlying the claim would . . . establish by clear and convincing

25   evidence that but for constitutional error, no reasonable factfinder would have found the applicant

26   guilty of the underlying offense."  28 U.S.C. § 2254(e)(2).

27        "[A] failure to develop the factual basis of a claim is not established unless there is lack of

28   diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."  *Williams*

1  *(Michael) v. Taylor*, 529 U.S. 420, 432 (2000). "A petitioner has not neglected his or her rights in

2  state court if diligent in efforts to search for evidence.' *Bragg v. Galaza*, 242 F.3d 1082, 1090,

3  amended by 253 F.3d 1150 (9th Cir. 2001).

> The question is not whether the facts could have been discovered
> but instead whether the prisoner was diligent in his efforts. The
> purpose of the fault component of "failed" is to ensure the prisoner
> undertakes his own diligent search for evidence. Diligence for
> purposes of the opening clause depends upon whether the prisoner
> made a reasonable attempt, in light of the information available at
> the time, to investigate and pursue claims in state court; it does not
> depend . . . upon whether those efforts could have been successful.

*Williams (Michael),* 529 U.S. at 435.

10      Petitioner does not argue that good cause entitles her to pursue discovery but simply

11  assumes that she is entitled to an evidentiary hearing to discover whether facts exist to support her

12  existing claims or to create new ones.

13      A habeas petitioner may not presume entitlement to an evidentiary hearing, discovery, or

14  both. *Bracy*, 520 U.S. at 903-05. "The mere request for an evidentiary hearing may not be

15  sufficient to establish diligence if a reasonable person would have taken additional steps."

16  *Atwood*, 489 F.Supp.2d at 1007. *See also Koste v. Dormire*, 345 F.3d 974, 985-86 (8th Cir. 2003)

17  (finding lack of diligence despite request for evidentiary hearing when petitioner made no effort

18  to develop record or assert facts supporting ineffective assistance of counsel claim); *Dowthitt v.*

19  *Johnson*, 230 F.3d 733, 758 (5th Cir. 2000) (finding petitioner not to have been diligent when he

20  failed to secure affidavits of family members that were easily obtained without court order at

21  reasonable expense).

22      In rejecting Petitioner's claims, the California Court of Appeals explicitly found that

23  Petitioner did not meet applicable standards of diligence. As noted in the procedural history

24  discussion above, on October 30, 2009, the court found cognizable two of the claims set forth in

25  Petitioner's third petition for habeas corpus and remanded the matter, directing the Tuolumne

26  Superior Court to issue an order to show cause. On May 20, 2010, the Superior Court denied the

27  petition, concluding that "the record before it d[id] not support the claims made by Petitioner on

28  those issues." *In re Kelly Alice Kessler*, No. CRW 27950 (Tuolumne County Sup. Ct. May 20,

18

2010), reproduced at Doc. 29 at 62.  On June 11, 2010, Petitioner again sought habeas relief from the Court of Appeals.

In denying the petition, the Court of Appeals observed, "It is apparent from the record that the superior court was able to determine from the return the factual and legal issues presented for its determination and proceeded to resolve those issues, including the credibility of witnesses and experts."  *In re Kelly Alice Kessler*, No. F060284 (Cal.Ct.App. Aug. 20, 2010),  Doc. 29 at 64.  The Court of Appeals rejected Petitioner's claims concerning the nature of her Nevada burglary conviction, finding that Petitioner "failed to show why her challenges to the Nevada prior conviction and trial counsel's alleged ineffectiveness should not be rejected because she waived them or was guilty of unclean hands in failing to obtain the transcripts of the change of plea and sentencing in the Nevada proceeding prior to the destruction of the reporters' notes."  *Id.*, Doc. 29 at 66.  It emphasized Petitioner's failure to support her claims factually:

> It was not the courts' burden to keep informing petitioner of all of her factual deficiencies so that she could attempt to cure them in subsequent petitions in a piecemeal, successive fashion. Nevertheless, this court's and the superior court's prior orders informed petitioner of some of the above described deficiencies in her prior writs.  Despite these deficiencies, the court's OSC allowed petitioner to prove in the superior court her entitlement to relief. (*Duvall, supra,* 9 Cal.4th 464; *In re Hochberg, supra,* 2 Cal.3d 860.) In the superior court she chose not to provide more specific information (if necessary by subpoena and compelled testimony) from the victim, petitioner, attorney, trial counsel, Kevin Wallen, or her experts.  Petitioner has failed to show why she should be entitled to any relief, including another evidentiary hearing, when she has repeatedly insisted in successive petitions on presenting information which was limited, incomplete, or conclusional in critical areas.
>
> *In re Kelly Alice Kessler*, F060284 (Cal.Ct.App. Aug. 20, 2010), Doc. 29 at 67-68.

Petitioner has never outlined what specific evidence she seeks in further discovery. Instead, she expresses a clear intent to continue her investigation until she uncovers some sort of evidence she can use to formulate a winning habeas claim.  The record before this Court fully supports the Court of Appeals' conclusion that Petitioner failed to act diligently in securing necessary evidence and discovering relevant facts.

Petitioner has also pointedly failed to disclose information of which she herself has

1    relevant knowledge.  Many of these omissions are relevant to whether Petitioner can prevail on

2    her claims.  For example, although Petitioner certainly knows whether the offense that gave rise

3    to her Nevada burglary confession occurred in an inhabited residence, she has never provided that

4    information at any point in the post-conviction proceedings.   Nor has she disclosed any

5    information concerning conversations with her trial attorney regarding the handling of her prior

6    felony convictions.

7         The Court of Appeal reasonably considered the legal and factual bases advanced by

8    Petitioner and concluded that Petitioner failed to carry her burden of proof.  It found that

9    Petitioner's lack of diligence in finding and preserving evidence was tantamount to waiver and

10   unclean hands that precluded her prevailing on her claims of ineffective assistance of counsel and

11   misapplication of the Nevada burglary conviction.  Its conclusions were reasonable.  That other

12   jurists might have reached different decisions does not mandate further fact funding in this case.

13   The undersigned recommends that the Court deny Petitioner's request for additional discovery

14   and an evidentiary hearing.

15   **VII.    Due Process: Sentencing Enhancement**

16        Based on three prior felony convictions, Petitioner received an enhanced sentence under

17   the California three strikes law.  Petitioner challenges the state court's enhancement of her

18   sentence in both claim two, in which she asserts that the prosecutor misrepresented to the Court

19   that he had proof that Petitioner's 1995 Nevada burglary conviction was equivalent to first degree

20   burglary in California, and claim four, in which she claims that the California court violated her

21   due process rights by concluding that the Nevada conviction was a strike.  Because the state court

22   resolved both claims based on Petitioner's admission of her Nevada burglary conviction and its

23   status as a strike, the undersigned addresses both claims in a single discussion and recommends

24   that the Court do the same.

25        **A.    Prosecutor's Misrepresentation and _Napue_**

26        In her second claim, Petitioner contends that, under _Napue v. Illinois_, 360 U.S. 264

27   (1959), "the prosecution violated Petitioner's right to due process under the Fifth and Fourteenth

28   Amendments by representing to the Tuolumne County Superior Court that there was legally

1   cognizable evidence that Petitioner had been convicted in Nevada of the equivalent of first degree

2   burglary in California when in fact the public record of that conviction contains no such

3   evidence." Doc. 22-1 at 86.  The prosecutor has a constitutional duty to correct false testimony.

4   *Napue*, 360 U.S. at 269.  When the state permits a witness to testify to facts which the prosecution

5   knows to be false, the failure of the prosecutor to correct the testimony which he knows to be

6   false deprives the defendant of due process of law, even though the prosecution did not solicit the

7   false evidence.  *Id.*  In this case, however, no state witness testified regarding Petitioner's prior

8   Nevada conviction.

9          Petitioner contends that she was "denied her Fifth and Fourteenth Amendment right[s] to

10   due process of law by the prosecution's representations to the Tuolumne County Superior Court,

11   on which the Court of Appeal for the State of California, Fifth District, expressly relied in

12   affirming the judgment and sentence, that the prosecution was in possession of evidence that

13   Petitioner was convicted in the state of Nevada of a crime that qualified as First Degree Burglary

14   under California law when in fact no such (legally-cognizable) evidence existed." Doc. 22-1 at

15   87.  Reconciling her arguments with the circumstances and holding in *Napue* is challenging.  As

16   Respondent puts it, "the facts which Petitioner alleged simply bore no connection to the context

17   in which the Supreme Court has ever applied *Napue*." Doc. 29 at 40.

18          Petitioner's attempt to characterize the circumstances of the sentencing enhancement as a

19   violation of the *Napue* holding is doomed from its start for many reasons, not least of which is

20   that Petitioner admitted both her prior conviction and its status as a strike.  As a result of

21   Petitioner's admissions, the prosecution was never required to produce evidence regarding the

22   Nevada burglary conviction.  In fact, the California courts rejected Petitioner's claim based on her

23   tactical decision to admit both the Nevada conviction and its status as a strike under California

24   law before trial.

25          **B.     California's Three Strikes Sentencing Law**

26          The California Legislature enacted its enhanced sentencing (three strikes) law "to ensure

27   longer prison sentences and greater punishment for those who commit a felony and have been

28   previously convicted of one or more serious and/or violent felony offenses."  Cal. Penal Code

§ 667(b).  The law provides that the prison sentence of an individual convicted of a serious felony, who has previously been convicted of a serious felony or its equivalent in another jurisdiction, shall be enhanced by another consecutive five-year term for each such prior conviction.  Cal. Penal Code § 667(a)(1).

California Penal Code § 1192.7 defines the term "serious felony" by providing a list of 42 serious felonies, including "(18) any burglary of the first degree."  Cal. Penal Code 667(a)(4).  California defines burglary as follows:

> Every person who enters any house, room, apartment, tenement, shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, as defined in Section 21 of the Harbors and Navigation Code, floating home, as defined in subdivision (d) of Section 18075.55 of the Health and Safety Code, railroad car, locked or sealed cargo container, whether or not mounted on a vehicle, trailer coach as defined by the Vehicle Code, inhabited camper, as defined in Section 243 of the Vehicle Code, vehicle as defined by the Vehicle Code, when the doors are locked, aircraft as defined by Section 21012 of the Public Utilities Code, or mine or any underground portion thereof, with intent to commit grand or petit larceny or any felony is guilty of burglary.  As used in this chapter, "inhabited" means currently being used for dwelling purposes, whether occupied or not.  A house, trailer, vessel designed for habitation, or portion of a building is currently being used for dwelling purposes if, at the time of the burglary, it was not occupied solely because a natural or other disaster caused the occupants to leave the premises.

Cal. Penal Code § 459.

California's Penal Code defines burglary in the first degree:  "Every burglary of an inhabited dwelling house, vessel, as defined in the Harbors and Navigation Code, which is designed for habitation, floating home, as defined in subdivision (d) of Section 18075.55 of the Health and Safety Code, or trailer coach, as defined by the Vehicle Code, or the inhabited portion of any other building, is burglary of the first degree."  Cal. Penal Code § 460(a).

In this case, the underlying criminal complaint alleged that Petitioner had prior felony convictions of robbery (Cal. Penal Code § 212.5(b)) and receiving stolen property (Cal. Penal Code § 496(a)) in San Francisco, California (December 1, 1994), and burglary (Nev. Rev. Stats. § 205.060) in Carson City, Nevada (August 1, 1995).  Petitioner concedes that the San Francisco convictions counted as strikes, but argues that the Nevada burglary conviction did not constitute a

1    strike because the Nevada statute does not include the California statutory requirement that the

2    residence in which the alleged burglary occurred be inhabited.

3        **C.        The Nevada Burglary Conviction**

4        On July 10, 1994, Petitioner was arrested on charges of burglary (Nev. Rev. Stats.

5    § 205.060), possession [of a controlled substance] not for purpose of sale (Nev. Rev. Stats. §

6    453.336), and unlawful use of a controlled substance (Nev. Rev. Stats. § 453.411).  Doc. 7-1 at

7    24.  In Nevada, "[a] person who, by day or night, enters any house, room, apartment, tenement,

8    shop, warehouse, store, mill, barn, stable, outhouse or other building, tent, vessel, vehicle, vehicle

9    trailer, semitrailer or house trailer, airplane, glider, boat or railroad car, with the intent to commit

10   grand or petit larceny, assault or battery on any person or any felony, is guilty of burglary."  Nev.

11   Rev. Stats. § 205.060.[3]  In Nevada, unlike in California, a defendant may be guilty of burglary

12   even if he or she enters a house that is not inhabited.  *State v. Dan*, 18 Nev. 345 (1884).

13       According to the criminal information, Petitioner "commit[ed] a felony, to-wit:

14   BURGLARY, as defined by NEV. REV. STATS. §  205.060,  in the manner following, to-wit:

15   That the said Defendant did willfully and unlawfully enter a dwelling located at 909 Nye Lane,

16   Carson City, Nevada, with the intent to then and there commit larceny."  Doc. 7-1 at 41.  The

17   investigating officer reported that "I responded to a report of a burglary in progress at 909 W.

18   Nye.  Upon arrival I found [Petitioner] at the side of the house with a clear plastic bag with the

19   victim's jewelry protruding from her pants pocket.  I arrested [Petitioner] for burglary."  Doc. 7-1

20   at 39.  Among the witnesses to the crime was Jerry Lynn, 909 West Nye Lane, Carson City,

21   Nevada.  Doc. 7-1 at 43.  Implicit in the evidence included within the state court record is that

22   Lynn lived in the dwelling at 909 West Nye Lane, which Petitioner and another person entered

23   and from which they stole Lynn's jewelry.

24       On June 20, 1995, Petitioner pleaded guilty to count 1, burglary, a felony contrary to

25   Nevada Revised State 205.060.  Doc. 7-1 at 46-49.  She was sentenced to four years in prison.

26

27   [3] Petitioner asserts that a different statute, Nev. Rev. Stats. § 205.067, Invasion of the Home, addresses burglary of an
     inhabited dwelling.  Section  205.067, however, is not analogous to the California crime of first degree burglary
     because § 205.067 does not require that entry be made with intent to commit grand or petit larceny or any other
28   felony.

1  Doc. 7-1 at 50.

2      **D.**    **Petitioner Admitted the Nevada Burglary Conviction**

3        The trial record in this case documents Petitioner's tactical decision, in consultation with

4  her trial attorney, to admit her Nevada burglary conviction and to concede that it was a strike.  In

5  addition to the prior convictions' role in Petitioner's sentencing, her prior felony convictions were

6  also elements of the charge of felony possession of a firearm with a prior conviction (Cal. Penal

7  Code § 12021.1), which was the first count of the charges against her.  The defense strategy was

8  to minimize discussion of Petitioner's prior crimes and thus, minimize juror prejudice.

9  Petitioner's felony record included a series of crimes that involved threatening and stealing from

10  others, often friends or acquaintances, a pattern that jurors could easily have interpreted to

11  indicate likely guilt of the pending charges.

12        Although the proceedings were protracted, the Court includes the full text of Petitioner's

13  admission to illustrate fully the circumstances under which she admitted the Nevada burglary

14  conviction and its status as a strike under California law.  Contrary to Petitioner's claims that she

15  was poorly counseled and reluctant to admit the conviction, the transcript reveals Petitioner's

16  willing acknowledgement of the Nevada conviction, her admission that the Nevada conviction

17  was a strike under California law, and her agreement with the tactical objective of keeping the

18  details of the Nevada conviction out of the felony weapon possession trial.  Petitioner and counsel

19  had previously discussed her prior convictions and the most desirable way to address them when

20  facing the current charges and is evident in the questioning that leads to Petitioner's admission.

21  Note, also, the time and patience of Petitioner's trial attorney, with input from the prosecutor and

22  the trial judge, to ensure that Petitioner understood the nature of her admissions and the reasons

23  for making them.

24             COURT:    Let the record show we are meeting outside the

25             presence of the jury, that the defendant is present with her counsel, Mr. Hove, and Mr. Knowles.[4]

26             This morning, before going on the record, we discussed a number

27             of matters in chambers, and among those was the defendant's priors.
           And Mr. Hove stated that the defendant would, in fact, admit those

---

28  [4] Knowles was the assistant district attorney who prosecuted the case.

1    priors.

2    Is that correct, Mr. Hove?

3    MR. HOVE:   That's correct, your honor.

4    Miss Kessler, you and I have discussed that fact that in the charging
     Information against you, there are a number of priors that are what
5    we call alleged or stated.  Do you understand that?

6    THE DEFENDANT:  Um, no.

7    MR. HOVE:   The district attorney, in response to Count I –

8    THE REPORTER:    Excuse me, can you use your microphone
     please?

9

10

11   MR. HOVE:   Count I alleges you are a felon, and alleges it was a
     firearm that proves your – he has alleged various priors that have –
12   that you have suffered, that primarily being the robbery out of
     Nevada and the burglary and robbery in San Francisco.  Do you
13   understand that?

14   THE DEFENDANT:  That's incorrect.  But what – the charges are
     correct, I did the time already.

15   MR. HOVE:   No, it's not a matter of the time.  We have discussed
     the fact that you have suffered those convictions, is that correct?
16

17   THE DEFENDANT:  Burglary and robbery, yes.

     MR. HOVE:   Yes.
18
     THE DEFENDANT:  14 years ago.
19
     MR. HOVE:   Yes.  Now, what I told and have represented to them
20   and we have discussed is the fact that we do not wish the jury to
     hear about those priors, isn't that correct?
21
     THE DEFENDANT:  That is correct.  However, if need be, I'm
22   willing –

23   MR. HOVE:   No, not – just listen to what I'm saying.  We have
     discussed that, is that correct?
24
     THE DEFENDANT:  Yes, we have.
25
     MR. HOVE:   All right.  And we have decided tactically that we do
26   not want the jury to hear – have those priors read and have them try
     that whether, in fact, you were convicted or not of those priors, isn't
27   that correct?

28   THE DEFENDANT:  We've discussed that.

25

1    MR. HOVE:   Yes.  And it's our decision to not have them try that.
     We are going to admit those priors, we've discussed that, is that
2    correct?

3    THE DEFENDANT:  We're going to admit the priors?

4    MR. HOVE:   Yes.

5    THE DEFENDANT:  My prior convictions?

6    MR. HOVE:   Yes.

7    THE DEFENDANT:  Yes.

8    MR. HOVE:   Okay.   Now, you understand in doing that, you
     would have the right to what's called a trial by judge, Judge Stone,
9    or by the jury to determine, receive evidence of these priors, do you
     understand that?
10
     THE DEFENDANT:  Receive the evidence, I don't understand that.
11   What, evidence of the priors?

12   MR. HOVE:   Yes, they would present the packet showing that you
     are the person who suffered these prior convictions pursuant to
13   certified –

14   THE DEFENDANT:  Okay.

15   MR. HOVE:   Okay?  We discussed that, and we are – you're going
     to – because you admit it, you give up that trial, you understand
16   that?  You don't have a trial on the priors, we're just trying the case
     itself.
17
     THE DEFENDANT:  (Pause.) Forgive me, I don't understand that.
18
     MR. HOVE:   Just as you're having the trial about what happened,
19   you also have a right to have a trial about whether you were
     convicted of these priors.
20
     THE DEFENDANT:  Well, I know we had once.
21
     MR. HOVE:   I know we know you are.  And because of that we
22   decided you are going to admit them, correct?

23   THE DEFENDANT:  Correct.

24   MR. HOVE:   And because you admit them, you are giving up your
     right to a jury trial, correct?
25
     THE DEFENDANT:  For this?
26
     MR. HOVE:   For the priors only.
27
     THE DEFENDANT:  I made a deal for those.
28

26

1   MR. HOVE:   So what I'm saying, you're giving – we don't want to try the priors, do you understand?

2

3   THE DEFENDANT:  No, because I've already been – I don't – I'm sorry.  Please have patience with me.  I don't understand.  I've already been to prison for those, so how can you charge me with them again.

4

5   MR. HOVE:   Because they are enhancements as to whether or not you can have a firearm.

6

7   THE DEFENDANT:  Oh.  Oh.  Oh.

    MR. HOVE:   And because of that, we've discussed on other occasions –

8

9   THE DEFENDANT:  I'm sorry.

10

11   MR. HOVE:   --we have decided we don't want the jury to hear that, correct?

12

13   THE DEFENDANT:  Correct.  I'm following you now.

    MR. HOVE:   Because you admit the priors, you're not going to have a trial, right?

14

15   THE DEFENDANT:  (No response.)

16   MR. HOVE:   So you give up the right to have a trial, is that correct?

17

18   THE DEFENDANT:  Okay.

    MR. HOVE:   Is that "yes"?

19

20   THE DEFENDANT:  Yes.

21   MR. HOVE:   Okay.  At the trial, you would have the right to have – to confront the evidence, which, in this case, would be certified records of your convictions.  You know, they would bring --

22

23   THE DEFENDANT:  They could use them against me?

    MR. HOVE:   Right.

24

25   THE DEFENDANT:  Okay.

26   MR. HOVE:   And I could cross-examine any of the witnesses about that, which would be a custodian of records, right?

27   THE DEFENDANT:  Okay.

28   MR. HOVE:   All right.   And are you giving up the right to

27

1    confront that, the certified documents, and have me cross-examine
     them, do you understand that?

2    THE DEFENDANT: Okay. Yes.

3    MR. HOVE:   And do you give that, give up that right to confront
4    and cross-examine?

5    THE DEFENDANT: Yes, that's the past.

6    MR. HOVE:   Right. You also have the right to produce evidence
     in your own behalf, what's called use the subpoena processes or the
7    power of the Court to gain evidence in this case, if you wanted to
     try to contest the priors. But we know there's nothing to contest,
8    correct?

9    THE DEFENDANT: Right.

10   MR. HOVE:   So, do you want to give up the right to use the
     powers of the Court?
11
     THE DEFENDANT: Yes.
12
     MR. HOVE:   Okay. And finally, you have the right against self-
13   incrimination. Because by admitting the priors, you're admitting
     that you suffered –okay, that was you, you understand that?
14
     THE DEFENDANT: Yes.
15
     MR. HOVE:   And do you give up that right?  As to the priors
16   only?

17   THE COURT: Just to – only as to the priors.

18   THE DEFENDANT: But I will still be able to talk?

19   MR. HOVE:   At the trial, you can, if you want to, but, as to the
     priors, because you're admitting them, you're giving up the right
20   against self-incrimination regarding the priors, do you understand?

21   THE DEFENDANT: Okay. Okay. Please forgive me again.

22   MR. HOVE:   Okay.

23   THE DEFENDANT: Okay. So I give up my right for him to bring
     this up, and then he can't – he can't tell the jury about this on the
24   stand?

25   MR. HOVE:   No, he can. He can. He is not going to prove these
     things up if you testify. As I've discussed with you over the noon
26   hour, the Court will allow him to ask you about your priors.

27   THE DEFENDANT: Oh.

28   MR. HOVE:   But, in terms of whether or not before we get to that

28

1   point the jury will never hear about these priors if you never testify, do you understand that?  That's the point.

2   THE DEFENDANT:  So, I have a choice.  I can either give up my right for him to cross-examine me, or whatever you call it, on these and not testify, testify on this case?

3

4   MR. HOVE:   No.   You can still testify on this case, but you're giving – your right is against self-incrimination on the priors only. You're saying –

5

6   THE DEFENDANT:  Well, then –

7   MR. HOVE:   -- "I suffered a prior."

8   THE DEFENDANT:  Of course, I want to do that.

9   MR. HOVE:   You want to do that?

10   THE DEFENDANT:  I want to give up –

11   MR. HOVE:   Your right against self-incrimination on the priors?

12   THE DEFENDANT:  (Nods head.)

13   MR. HOVE:   Okay.

14   THE DEFENDANT:  Because then the jury will believe this case.

15   MR. HOVE:   That's right.   Now, which you understand is the direct consequence of that by these admissions is that, in fact, these priors are strikes and he won't have to prove them later on to a jury, do you understand that?

16

17

18   THE DEFENDANT:  Right.  Right.

19   MR. HOVE:   Okay.  And we have decided that's what we want to do?

20

21   THE DEFENDANT:  Yes.

22   MR. HOVE:   Okay.   And are you doing this, what's called – I understand you're upset, but you've been upset all day about the trial.

23

24   THE DEFENDANT:  All year.

25   MR. HOVE:   Okay.   Are you doing this what's called freely and voluntarily?

26   THE DEFENDANT:  Well, of course.

27   MR. HOVE:   Okay.  Well, I mean, the judge has to be satisfied.

28   THE DEFENDANT:  Yes.

1    MR. HOVE:   Nobody's twisting your arm?

2    THE DEFENDANT:  Yes, Your Honor.

3    MR. HOVE:   To get you to do this?

4    THE DEFENDANT:  No.

5    MR. HOVE:   Okay.  You're doing it – okay.

6    THE DEFENDANT: Because I don't want him to drag that dirt
     into this.

7    MR. HOVE:   Fine.

8    THE DEFENDANT:  Because I already paid for that.

9    MR. HOVE:   Okay.  Understood.

10   I don't know if the Court needs anything further.

11   THE COURT:  I'm satisfied with the waiver.

12   Miss Kessler, do you admit or deny a prior violation of Section
     212.5(b), that's robbery, of the Penal Code, with a conviction date
13   on the first day of December of 1994 in San Francisco Superior
     Court, do you admit or deny that?
14

15   THE DEFENDANT:  Yes, Your Honor, I did – I admit.

16   THE COURT:   And do you admit or deny a prior violation of
     burglary in the Carson City, Nevada, District Court with the
17   conviction date the 1st day of August of 1995, do you admit or deny
     that?
18

19   THE DEFENDANT:  I agree to that, yes.

20   MR. HOVE:   He's asking you, do you admit that?

21   THE DEFENDANT:  That I actually did the crime?

22   MR. HOVE:   Do you admit that you suffered that conviction?

23   THE DEFENDANT:  Yes, I did.

24   THE COURT: And do you admit or deny a prior violation of
     Section 496, paren (a), that's possession of stolen property, at the
25   same date and time as the robbery, that is, the 1st day of December
     of 1994, in San Francisco Superior Court?
26   THE DEFENDANT:  Yes, Your Honor.

27   (WHEREAS, Discussion was had off the record between the
     defendant and her counsel.)
28

1    THE COURT: And do you admit or deny that you served a sentence in regard to the robbery and the possession of stolen property?

2

3    THE DEFENDANT:  Admit it, Your Honor.

     MR. KNOWLES:        That was a prison sentence.

4

     MR. HOVE:   Yeah, we'll stipulate at what he's saying.  The judge is asking did she suffer and serve a prison sentence?

5

6    Yes, you went to prison pursuant to that, is that correct?

7    THE DEFENDANT:  That is correct, Your Honor.

8    THE COURT:        All right.  And did you suffer a further felony conviction within five years of that?

9

     THE DEFENDANT:  No, your honor.

10

///

11

12   MR. HOVE:   I think what the Court means is between the time of the first conviction and the second conviction there, they were both within a five-year period?

13

14   THE DEFENDANT:  Yes, I was in custody.

     THE COURT:        The Nevada conviction and the San Francisco conviction were within five years of each other?

15

16   THE DEFENDANT:  They were 21 days apart.

17   THE COURT:        Are the dates wrong here?  Because the San Francisco conviction is 12-1-94, and the Nevada conviction –

18

19   THE DEFENDANT:  They came and picked me up.

     THE COURT: Was 8-1-95.

20

     MR. HOVE:   The date –

21

     MR. KNOWLES:        That's correct, Your Honor.

22

     MR. HOVE:   What you're confusing is this –

23

     MR. KNOWLES:        The abstract is – the sentencing is 8-1-95.

24

     MR. HOVE:   Right.

25

     What happened was, when you suffered the conviction, that's basically the date that you were sentenced.  So, what happened is, you got sentenced in the one place, and then later, you got sentenced in another one, is that correct?

26

27

28   THE DEFENDANT:  Yes. They came and got me.

31

MR. HOVE:  Right.  You got sentenced first in San Francisco in '94, then you went in '95 and got sentenced in Nevada, is that correct?

THE DEFENDANT:  That is correct.

MR. HOVE:  That is what the Judge means when he's asking you about the two sentences occurring within a five-year period.

THE COURT:  Are you satisfied with the admission, Mr. Knowles?

MR. KNOWLES:  Yes, Your Honor.

THE COURT:  I will find that Miss Kessler has made a free and voluntary admission, knowing and intelligent waiver of her rights, and based upon stipulation of counsel, I will find that there is, in fact, a factual basis for the admission.  Do I have that stipulation?

MR. HOVE:  Yes, Your Honor.

MR. KNOWLES:  Yes, Your Honor.

MR. HOVE:  There is a factual basis.

Trial transcript (February 26, 2003) at 22-36.

### E.    California Court of Appeals Decision

Because the California Supreme Court summarily denied review, the Court must "look through" its summary denial to the last reasoned decision, which is, for these claims, the opinion of the California Court of Appeal in Petitioner's direct appeal.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-06 (1991).  The Court of Appeal rejected Petitioner's argument that the State was required to prove that the Nevada burglary conviction was a strike under California law: "[A]ppellant's argument is without merit because it ignores the fact that the lack of proof is the direct result of appellant's strategic decision to admit that she was convicted of the Nevada burglary and to admit that the Nevada burglary was a 'strike.'"  *People v. Kessler*, 2004 WL 1067965 at *2 (Cal.Ct.App. May 13, 2004) (No. F043033).

### F.    Petitioner's Admission of Prior Conviction and its Status as a Strike

Neither the United States nor the California Constitutions extend a criminal defendant's right to a jury trial to the factual determination of whether that defendant has suffered a prior conviction.  *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000) ("Other than the fact of a prior

32

1   conviction, any fact that increases the penalty for a crime beyond the prescribed statutory

2   maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *People v. Epps*,

3   25 Cal.4th 19, 23 (2001) ("The right, if any, to a jury trial of prior conviction allegations [does not

4   derive] . . . from the state or federal Constitution.").  The California Penal Code provides a state

5   right that "the question of whether or not the defendant suffered the prior conviction shall be tried

6   by the jury . . . or by the court if a jury is waived."  Cal. Penal Code § 1025(b).  "Whenever the

7   fact of a previous conviction or another offense is charged in the accusatory pleading, and the

8   defendant is found guilty of the offense with which he is charged, the jury, or the judge if a jury

9   trial is waived, must unless the answer of the defendant admits such previous conviction, find

10   whether or not he has suffered such previous conviction."  Cal. Penal Code § 1158.

11       "Under California law, a defendant's admission of a prior felony conviction that will be

12   used as a sentence enhancement is the 'functional equivalent' of a guilty plea to a separate charge,

13   and therefore, it may not be accepted unless the defendant understands the consequences of the

14   admission." *Wright v. Craven*, 461 F.2d 1109, 1110 (9th Cir. 1972) (internal citations omitted).

15   As a result, the defendant must be "aware of the consequence of his admission, such as possible

16   enhancement of punishment imposed for a separate criminal offense." *Bernath v. Craven*, 506

17   F.2d 1244, 1245 (9th Cir. 1974).   To the extent that Petitioner contends that she did not

18   understand the nature of her waiver of her statutory right to jury determination of her prior

19   convictions, her contentions are a matter of state law.

20       "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*,

21   502 U.S. 62, 67 (1991) (*citations omitted*).  *See also Oxborrow v. Eikenberry*, 877 F.2d 1395,

22   1400 (9th Cir. 1989) ("[E]rrors of state law do not concern us unless they rise to the level of a

23   constitutional violation.").  Federal habeas review does not extend to a state court's interpretation

24   of its own laws, including sentencing laws. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Campbell*

25   *v. Blodgett*, 997 F.2d 512, 522 (9th Cir. 1992); *Miller v. Vasquez*, 868 F.2d 1116, 1118-19 (9th Cir.

26   1989).  The AEDPA imposes "a highly deferential standard for evaluating state-court rulings,"

27   requiring "that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537

28   U.S. 19, 24 (2002) (quoting *Lindh*, 521 U.S. at 333 n. 7.

1    To allege a cognizable federal claim based on a state sentencing error, a petitioner must

2    show that the error was "so arbitrary or capricious as to constitute an independent due process"

3    violation.  *Richmond v. Lewis*, 506 U.S. 40, 50 (1992).  Three federal constitutional rights are

4    implicated in the context of a guilty plea: (1) the privilege against compulsory self-incrimination,

5    (2) the right to trial by jury, and (3) the right to confront one's accusers.  *Boykin v. Alabama*, 395

6    U.S. 238, 243 (1970).  Waivers of these constitutional rights "not only must be voluntary but must

7    be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and

8    likely consequences." *Brady v. United States*, 397 U.S. 742, 748 (1970).

9    Explicit advisement on each of the implicated constitutional rights is not required.

10   *Wilkins v. Erickson*, 505 F.2d 761, 763 (9th Cir. 1974).  The mere failure to advise the defendant

11   explicitly of her privilege against self-incrimination or her right to confrontation does not, of

12   itself, mean that the defendant's admission of her prior felony conviction was not knowing,

13   intelligent, and voluntary.  In any event, the transcript of Petitioner's admission of her prior

14   convictions well documents that Petitioner's trial attorney, assisted by the trial judge and the

15   prosecutor, proceeded carefully to ensure that Petitioner understood that by admitting her prior

16   convictions, she was waiving her right against self-incrimination, her right to have the prior

17   convictions proved in the course of trial, and the right to have the jury determine the existence of

18   the prior convictions.  Through her admissions, Petitioner communicated that she wanted to

19   minimize the jury's exposure to the prior convictions and related details even though the nature of

20   count one (felony possession of a firearm with prior conviction (Cal. Penal Code § 12021.1))

21   required the State to prove that Petitioner had a prior felony conviction.  By admitting her prior

22   convictions, Petitioner discussed with counsel and achieved the tactical objective of keeping the

23   highly prejudicial details of those prior convictions from the jury.

24   A defendant's tactical decision to plead guilty generally relieves the prosecution of its

25   burden of proving the elements of the substantive offense charged.  Applying the Ninth Circuit's

26   reasoning of *Wright*, the Eighth Circuit held that a defendant's voluntary and knowing stipulation

27   or admission of prior convictions "amounted to a waiver of [the defendant's] right to have the

28   State prove the prior offenses and of his right to rebut the State's evidence." *Cox v. Hutto*, 589

34

1 | F.2d 394, 396 (8th Cir. 1979) (per curiam).

2 | **G.**     **Summary and Recommendation**

3 |       The state court concluded that Petitioner voluntarily and knowingly admitted her prior

4 | felony convictions, including her Nevada burglary conviction and its status as a strike. Having

5 | made that factual determination, the state court applied federal law to conclude that Petitioner's

6 | admissions relieved the prosecution of its burden of proving that Petitioner's Nevada felony

7 | conviction of burglary and its status as a strike under California's sentencing enhancement (three

8 | strikes) statute. The undersigned recommends the Court find the state court's determination to

9 | have been reasonable under federal constitutional law and deny relief under claim two.

10 | **VI.**    **Ineffective Assistance of Counsel**

11 |       In her first claim, Petitioner contends that the ineffective assistance rendered by her trial

12 | counsel, Mr. Hove, deprived her of her Sixth Amendment right to the effective assistance of

13 | counsel. Specifically, Petitioner claims that Hove failed to (1) investigate her Nevada burglary

14 | conviction, which was improperly counted as a strike for sentencing purposes, and (2) advise

15 | Petitioner of her right to bifurcate the trial to keep the jury from learning that Petitioner had

16 | previous felony convictions. Respondent counters that (1) Petitioner did not carry her factual

17 | burden of proving that Hove failed to investigate the Nevada conviction, and (2) bifurcation was

18 | meaningless since the charge against Petitioner, possession of a weapon by a felon, required the

19 | prosecution to prove the prior felony conviction as an element of the crime.

20 | **A.**     **In General**

21 | **1.**     **Standard of Review**

22 |       The purpose of the Sixth Amendment right to counsel is to ensure that the defendant

23 | receives a fair trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he right to counsel

24 | is the right to effective assistance of counsel." *McMann v. Richardson*, 397 U.S. 759, 771 n. 14

25 | (1970). "The benchmark for judging any claim of ineffectiveness must be whether counsel's

26 | conduct so undermined the proper functioning of the adversarial process that the trial cannot be

27 | relied on as having produced a just result." *Strickland*, 466 U.S. at 686. *See also United States v.*

28 | *Cronic*, 466 U.S. 648, 658-59 (1984).

To prevail on a claim of ineffective assistance of counsel, a petitioner must demonstrate that her trial counsel's performance "fell below an objective standard of reasonableness" at the time of trial and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 688, 694. The petitioner bears the heavy burden of proving that counsel's errors were so serious that he or she was not functioning as the counsel guaranteed by the Sixth Amendment. *Id.* at 688; *Harrington*, 562 U.S. at 104. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 689).

"Surmounting *Strickland's* bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). A court must apply the *Strickland* standards carefully since post-conviction hindsight can threaten the integrity of the adversarial process that the Sixth Amendment is intended to preserve. 466 U.S. at 689-90. Unlike a reviewing court, counsel was present during the plea or trial and the proceedings that led up to it, was familiar with evidence outside the record, and interacted with the client, prosecutor, and judge. *Id.* "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).

The *Strickland* test requires Petitioner to establish two elements: (1) her attorney's representation was deficient and (2) prejudice. Both elements are mixed questions of law and fact. *Id.* at 698. These elements need not be considered in order. *Id.* at 697. "The object of an ineffectiveness claim is not to grade counsel's performance." *Id.* If a court can resolve an ineffectiveness claim by finding a lack of prejudice, it need not consider whether counsel's performance was deficient. *Id.*

*Strickland* and its progeny applies to the state court's evaluation of Petitioner's ineffective assistance claims. "Establishing that a state court's application of *Strickland* was unreasonable under § 2254(d) is all the more difficult." *Harrington*, 562 U.S. at 105. The Court explained:

The standards created by *Strickland* and § 2254(d) are both "highly

deferential," *id.* at 689 . . . *Lindh v. Murphy*, 521 U.S. [at 333 n. 7] . . ., and when the two apply in tandem, review is "doubly" so. *Knowles*, 556 U.S. at 123 . . . The *Strickland* standard is a general one, so the range of reasonable applications in substantial.  556 U.S. at 123 . . . Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Harrington*, 562 U.S. at 105.

## 2.   **Hove's Disciplinary Status**

In the course of her argument, Petitioner emphasizes the history of disciplinary cases brought against Hove by the State Bar of California, asserting that his representation of Petitioner suffered from the same misdeeds.  *See In re Hove*, 05-O-04300-LMA (December 21, 2007); *In re Hove*, 01-O-01267-JMR, 03-O-01200, and 04-O-11366 (February 16, 2006).

"There is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *Cronic*, 466 U.S. at 659 n. 26.  Representation by a lawyer previously suspended from practice by a state bar does not automatically result in the denial of the Sixth Amendment right to counsel. *United States v. Mouzin*, 785 F.2d 682, 696 (9th Cir. 1986).  "A defendant must show actual errors and omissions by counsel that a conscientious advocate would not have made, and which prejudiced him."  *Id.*

Petitioner has not made the necessary showing the counsel's purported errors and omissions prejudiced her.  Hove was disciplined for multiple cases of financial improprieties and one instance of abandoning a client.  Plaintiff has not shown that these disciplinary actions had any impact or connection with counsel's representation of her. For instance, nothing in the record suggests that Petitioner ever filed a disciplinary complaint against Hove as a result of his representing her.  Nor is any evidence presented of financial improprieties relating to his representation of Petitioner of the type for which Hove was repeatedly disciplined and eventually disbarred.  That Hove was disciplined for financial improprieties and one instance of abandoning a client has no direct relevance to Petitioner's allegations of ineffective representation.  Those

1    disciplinary actions are not connected to counsel's representation of Petitioner.  The Court

2    declines to speculate that because counsel was disciplined, his conduct in Petitioner's case fell

3    below the applicable standard of review.  Accordingly, the mere fact of Hove's history of

4    discipline and eventual disbarment in 2007 provides no basis to conclude that Petitioner's Sixth

5    Amendment right to counsel was violated by Hove's failure to investigate Petitioner's prior

6    Nevada conviction or to move to bifurcate the trial.

7         **B.**       **The State Opinions**

8         In its determination on Petitioner's direct appeal, the California Court of Appeals

9    concluded that Petitioner was not "denied the effective assistance of counsel by virtue of her trial

10   counsel having her admit that the Nevada burglary conviction was a 'strike' for purposes of the

11   three strikes law." *People v. Kessler*, 2004 WL 1067965 at *5-*6 (Cal.App. May 13, 2004) (No.

12   F043033) (reproduced at Doc. 29 at 48).

13              We cannot conclude, on the record before us, that trial counsel's
                representation fell below an objective standard of reasonableness.
14              Nor can we conclude that there is a reasonable possibility that if
                [Petitioner] had not admitted the strike she would have gotten a
15              better result.  The record includes the prosecutor's representation
                that he was prepared to show, if need be, that the Nevada burglary
16              was a burglary of an inhabited dwelling.  Presumably that is what
                would have happened if [Petitioner] had not admitted the "strike."
17              [Petitioner] thus has not shown that she was denied the effective
                assistance of counsel.
18
19              *Id.*

20        In her habeas petition, Petitioner contended that she was denied effective assistance of

21   counsel when Hove failed to advise her of her right to have a separate trial (bifurcate) on the issue

22   of her prior burglary conviction in Nevada.  She argued "that there is no legally cognizable

23   evidence that she was convicted on Nevada of an inhabited dwelling, or that she suffered a

24   conviction in which she inflicted great bodily harm, used a firearm or used a deadly weapon."

25   Doc. 29 at 60. Concluding that the record presented to it did not support Petitioner's contentions,

26   the Tuolumne Superior Court rejected her claims:

27              The Nevada burglary statute does not require that the burglary be of
                an inhabited dwelling.  To qualify as a strike in California, there
28              must be a showing that the conduct underlying the conviction
                suffered would have qualified as a strike under California law.  At

                                          38

trial, outside the presence of the jury, Petitioner admitted her two prior felony convictions, a robbery in San Francisco in 1994 and a burglary in Carson City, Nevada in 1995.  The trial transcript shows that her retained counsel advised her that she had a right to either trial by the Court on this issue, or trial before the jury, or that she could waive her right to trial and admit.  In this case, Petitioner admitted that the prior qualified as a strike, and the Court found the admission to be free and voluntary, and based upon the stipulation of counsel, found a factual base for the admission.

Doc. 29 at 60.

The Superior Court rejected Petitioner's claim that her counsel failed to advise her of her right to bifurcation on the prior convictions, finding that the transcript clearly demonstrated that (1) Hove had advised Petitioner that she could have either a jury trial or a court trial on the issue and (2) that Petitioner and Hove had discussed the question of admitting the prior convictions before the trial and had decided for tactical reasons that Petitioner would admit the prior strikes. *Id.*

Finally, the Superior Court addressed Petitioner's claims that no admissible evidence supported a conclusion that the Nevada burglary conviction was a strike:

In a previous habeas petition before the Fifth District Court of Appeal on this issue, the Court of Appeal, in denying that Petition, noted that Petitioner had failed to provide transcripts of the Nevada hearings or to explain why she should not be required to provide the transcripts.  That Court found that without the transcripts, Petitioner failed to provide a complete record of the Nevada prior conviction to show that it did not qualify as a "strike."   While Petitioner subsequently provided this Court with the documents comprising the public record regarding the Nevada felony conviction for burglary, Petitioner has acknowledged that there is no transcript of any of the proceedings, nor any court reporter notes from which the transcript could be created.   While the Fifth District Court of Appeal placed the burden on Petitioner to show that the prior Nevada conviction did not qualify as a strike, Petitioner here seeks to have the burden shift to Respondent to show it would qualify as a strike.

Petitioner claims that there are no admissible documents that will show the prior conviction qualifies as a strike.  Respondent has submitted a declaration stating the District Attorney's office was prepared to prove the prior Nevada conviction involved the burglary of an inhabited dwelling.  The prosecution was denied that opportunity because of the free and voluntary admission made by Petitioner.

To determine whether a prior out-of-state conviction involved conduct that would satisfy all the elements of the California statute,

a court may consider the entire record of conviction in addition to the statutory elements of the offense. (*People v. Reed* (1996) 13 Cal.4th 217, 226; *People v. Guerrero* (1988) 44 Cal.3d 343, 355.) The record of conviction considered by the court must consist of admissible evidence. (*In re Cruse* (2003) 110 Cal.App.4th 1495, 1499.) The record of conviction for the Nevada prior conviction, when viewed as a whole, demonstrates that the burglary was of an inhabited dwelling. The Nevada charging document indicated the burglary was of a dwelling. The witness list included the resident of that dwelling. A sworn affidavit from the arresting officer includes an admission from Petitioner that she had been inside the victim's house and took the victim's jewelry from her co-defendant and ran out of the house. She was found to have the jewelry in her possession.

Doc. 29 at 61-62.

The Superior Court noted that although the Court of Appeals had remanded the habeas petition to it for hearing on two claims found to be cognizable, Petitioner failed to produce evidence sufficient to prove those two claims. Accordingly, the Superior Court denied relief.

Petitioner then filed a new petition with the Court of Appeals in which she contended that the factual and legal determinations leading to the Court of Appeals' remand to the Superior Court were binding on the Court of Appeals and other California courts. The Court of Appeals rejected her contention, explaining that the remand resulted from its applying an assumption of correctness to the contentions that led to the remand. "It is apparent from the record that the superior court was able to determine from the return the factual and legal issues presented for its determination and proceeded to resolve those issues, including the credibility of witnesses and experts." Doc. 29 at 64. With regard to the Nevada burglary conviction, the court emphasized the insufficiency of the evidence that Petitioner presented to support her contentions:

The record of the Nevada proceeding did not include the change of plea and sentencing transcripts during which facts may have been brought out sufficiently establishing that the burglary qualified as a "strike" in California. The declarations from the court reporters asserted that their notes of these hearings had been destroyed sometime after June 27, 2003 and August 1, 2003. Although petitioner's counsel could have asked for the specific dates the notes were destroyed, those declarations did not include those dates.

The attorney representing petitioner in this writ (attorney) started investigating this case no later that July 21, 2003, because on that date attorney hired a private investigator. Petitioner failed to provide the date when attorney first began representing petitioner.

> Petitioner was sentenced on May 5, 2003. The notice of appeal was filed May 15, 2003. Counsel was substituted in place of [Petitioner] on July 3, 2003. The opening brief was filed on August 27, 2003. The appeal opinion filed May 13, 2004, rejected petitioner's contentions that the Nevada prior conviction did not qualify as a strike and that trial counsel was ineffective for not challenging the Nevada prior.
>
> Petitioner does not describe when she, attorney and her counsel on appeal became aware of the issues regarding the Nevada prior and trial counsel's ineffectiveness.
>
> Petitioner has failed to show why her challenges to the Nevada prior conviction and trial counsel's alleged ineffectiveness should not be rejected because she waived them or was guilty of unclean hands in failing to obtain the transcripts of the change of plea and sentencing in the Nevada proceeding prior to the destruction of the reporters' notes.
>
> Petitioner's declaration states that trial counsel never "discuss[ed] with [her] the facts relating to the" Nevada prior conviction and, had she known, she could have had a bifurcated trial on that prior,
>
> and would not have admitted it as a strike. Trial counsel refused to provide a declaration on this issue.
>
> Petitioner has failed to provide a detailed declaration regarding what she told counsel regarding the Nevada prior conviction and what counsel told her. Her denial that there was no discussion [*sic*] does not negate the possibility that unilateral statements were made that were pertinent to her claim that counsel was ineffective for not challenging that prior.

Doc. 29 at 66-67.

## C.   **Bifurcation**

In California, various criminal statutes authorizes increased punishment of a defendant when the prosecutor alleges and proves that the defendant has one or more prior convictions. *People v. Calderon*, 9 Cal.4th 69, 71 (1994). In such cases, "a trial court has the discretion, in a jury trial, to bifurcate the determination of the truth of an alleged prior conviction from the determination of the defendant's guilt of the charged offense, but is not required to do so if the defendant will not be unduly prejudiced by having the truth of the alleged prior conviction determined in a unitary trial." *Id.* at 72.

Petitioner claims that Hove failed to advise Petitioner of her right to bifurcate the trial to keep the jury from learning of her previous felony convictions. The Tuolumne County Superior

Court summarily rejected the claim, stating, "The transcript clearly shows that counsel stated to petitioner that she had the right to have either a court trial or a jury trial on the issue." *In re Kessler*, CRW 27950 at 5 (Tuolumne Cty. May 20, 2010), reproduced at Doc. 29 at 60.  The Superior Court's determination appears to refer to counsel's following statement in the course of Petitioner's admission:

> MR. HOVE:  Okay.   Now, you understand in doing that, you would have the right to what's called a trial by judge, Judge Stone, or by the jury to determine, receive evidence of these priors, do you understand that?

> Trial transcript (February 26, 2003) at 25.

The determination is based in evidence and reasonable.

Petitioner's claim that she was entitled to prevent the jury from learning that she had any prior felony convictions is frivolous.  The first charge against her, felony possession of a firearm with prior conviction (Cal. Penal Code § 12021.1), required the prosecution to prove that Petitioner had a prior felony conviction.

### D.   Failure to Investigate Nevada Conviction

#### 1.   Factual Insufficiency Regarding Deficient Representation

As she did in state court, Petitioner relies on her conclusory declaration that Hove failed to investigate her Nevada conviction and that she and Hove never discussed the facts related to her Nevada conviction prior to her in-court admission.  Doc. 7-1 at 8.  In the admission transcript, set forth in full above, however, Petitioner confirmed that she and Hove had previously discussed the strategy of admitting her prior convictions and their status as strikes under California law:

> MR. HOVE:   All right.  And we have decided tactically that we do not want the jury to hear – have those priors read and have them try that whether, in fact, you were convicted or not of those priors, isn't that correct?

> THE DEFENDANT:  We've discussed that.

> Trial transcript (February 26, 2003) at 24.

Petitioner also relies on the declaration of her habeas counsel, Jim Andres, that Hove told him that he had never "viewed the originals or copies of documents relating to the conviction [Petitioner] suffered in 1995 in the state of Nevada," and that the district attorney only showed

1    him copies of the documents relating to the Nevada conviction that were in the prosecution's

2    possession after the jury had been charged and retired to deliberate.  Doc. 7-1 at 13-14.

3    Significantly, Hove never signed the declaration that Andres had prepared and provided to

4    memorialize that information.  Nor does Andres' declaration address what discussion Petitioner

5    and Hove had regarding the Nevada conviction or the strategic decision that Petitioner would

6    admit the prior felony convictions and their qualification as strikes under California law.

7         Petitioner also provides expert opinion that Hove's failure to investigate constituted

8    deficient representation and argues (Doc. 22-1 at 62-63) that her case is "legally

9    indistinguishable" from *Rompilla v. Beard*, 545 U.S. 374 (2005), a capital case in which the

10   Supreme Court addressed the scope of investigation required of counsel preparing for the penalty

11   phase.  In *Rompilla*, defense counsel failed to investigate the defendant's prior conviction for rape

12   and assault, despite knowing that the prosecution intended to use a transcript the victim's

13   testimony in that case in the penalty phase to establish Petitioner's violent character and

14   propensity to commit crimes involving the use or threat of violence.

15        In arguing that *Rompilla* required the state court to find that Hove's representation of

16   Petitioner was deficient, Petitioner fails to acknowledge any distinction between applying

17   California's three strikes law to a prior felony conviction in her case and defending against the

18   use of damaging testimony in the penalty phase of a capital case.  Her superficial analysis

19   overlooks the key distinction: Rompilla provided extensive proof of his attorney's failure to

20   pursue mitigating evidence after (1) Rompilla himself evinced disinterest in the process, and (2)

21   family members and mental health experts offered nothing useful in counsel's attempts to develop

22   a mitigation case. Petitioner offers no evidence relating to Hove's development of her case.

23        The complete absence of any evidence concerning the nature of Hove's preparation for

24   Petitioner's trial makes any attempt to evaluate Hove's performance a speculative exercise.

25   Petitioner wants the Court to conclude that Hove simply failed to address the specifics of the

26   Nevada conviction, but the paucity of evidence permits many other conclusions.  For example, if

27   Petitioner herself provided the details of the Nevada offense to Hove, as she likely would have

28   done in discussion prior to a decision of whether or not to admit to the prior convictions, Hove

43

would not have needed to review the plea and sentencing transcripts to recognize that Petitioner and her co-defendant had burglarized an occupied residence, resulting in a conviction of a serious offense that qualified as a strike under California law.

Under California law, the "serious felonies" listed in Cal. Penal Code § 1192.7 refer "not to specific criminal offenses, but to the criminal conduct described therein, and applicable whenever the prosecution pleads and proves that conduct." *People v. Reed*, 13 Cal.4th 217, 222 (1996) (quoting *People v. Jackson*, 37 Cal. 3d 826, 832 (1985)). To establish the nature of the criminal conduct leading to a prior conviction, "the trier of fact may look to the *entire record of conviction* to determine the substance of the prior conviction." *People v. Guerrero*, 44 Cal.3d 343, 355 (1988) (emphasis added). When the Superior Court ultimately reviewed the record of conviction in the habeas remand, it concluded that Petitioner's burglary of 909 W. Nye Lane, Carson City, Nevada, the home of witness Jerry Nye, was a burglary of an inhabited dwelling, and thus, a serious felony for purposes of California's three strikes law.

In short, Petitioner failed to prove that Hove factually failed to investigate the Nevada conviction. As a result, she failed to overcome the presumption that her counsel's representation was within the range of acceptable assistance. *See Harrington*, 562 U.S. at 104.

In the direct appeal, the California Court of Appeals rejected Petitioner's claim that Hove's representation was deficient, finding that Petitioner failed to carry her burden of proof on the issue. *See* Doc. 29 at 48. On habeas, despite the state courts' repeatedly allowing Petitioner multiple opportunities to provide evidentiary proof, the Superior Court ultimately rejected the claim for failure of proof, and the Court of Appeals upheld its determination. In light of the inadequacy of the evidence presented by petitioner, that conclusion was reasonable.

## C.    Petitioner Did Not Prove Prejudice

Because the record failed to present a factual basis by which the state court could have found "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," Petitioner failed to prove prejudice, the second prong of the *Strickland* test. 466 U.S. at 688, 694. Thus, even if Petitioner had mustered evidence to support her claim that Hove never investigated the Nevada conviction, her ineffective assistance

44

1    claim would be unsuccessful because she did not, and could not, prove prejudice.   Before this

2    Court, Petitioner does not attempt to argue prejudice, but contends that the Court must assume

3    prejudice under *Cronic*, 466 U.S. 648.

### 1.    *Cronic* and the Presumption of Prejudice

5         "[T]he adversarial process protected by the Sixth Amendment requires that the accused

6    have 'counsel acting in the role of an advocate.'"  *Id.* at 656 (quoting *Anders v. California*, 386

7    U.S. 738, 743 (1967).  The goal is defense counsel who require "the prosecution's case to survive

8    the crucible of meaningful adversarial testing."  *Cronic*, 466 U.S. at 656.  A defense attorney can

9    satisfy the standard even if he or she has made demonstrable errors.  *Id.*  Courts must presume

10   that defense counsel was competent; the defendant bears the burden of proving a constitutional

11   violation.  *Id.*

12        In *Cronic*, however, the Supreme Court identified three situations in which the

13   circumstances are "so likely to prejudice the accused that the cost of litigating their effect in a

14   particular case is unjustified": (1) complete denial of counsel at a critical stage of the trial, (2)

15   complete failure of counsel to subject the case to serious adversarial testing, and (3) a counsel's

16   attempt to render assistance under circumstances in which even competent counsel were very

17   unlikely to succeed.  *Id.* at 659-62.  The Court cautioned such situations would be rare, including

18   only those of such magnitude that the likelihood "that any lawyer, even a fully competent one,

19   could provide assistance is so small that a presumption of prejudice is appropriate without inquiry

20   into the actual conduct of the trial."  *Id.* at 659-60.  Petitioner contends that a breakdown of the

21   adversarial process occurred in her trial as a result of Hove's failure to investigate the details of

22   her Nevada conviction and that the Court may simply presume prejudice in her case.

23        A "breakdown of the adversarial process" sufficient to give rise to a presumption of

24   prejudice requires an attorney to "*entirely* fail[] to subject the prosecution's case to meaningful

25   adversarial testing."  *Bell v. Cone*, 535 U.S. 685, 697 (2002) (quoting *Cronic*, 466 U.S. at 659

26   (emphasis added)).  "Under the *Cronic* test, it is the *totality* of [counsel's] efforts that we must

27   examine, not just part of them in isolation.  '[S]pecified errors made by counsel . . . should be

28   evaluated under the standards enunciated in *Strickland*.'"  *Gerlaugh v. Stewart*, 129 F.3d 1027,

1036 (9th Cir. 1997) (quoting *Cronic*, 466 U.S. at 666 n. 41).   *See also, e.g., Woods v. Donald*,

135 S.Ct. 1372, 1377-78 (2015) (state court's application of the *Cronic* presumption of prejudice

was not unreasonable when counsel was briefly absent during testimony about other defendants

that was irrelevant to the petitioner's theory of defense); *Bell v. Quintero*, 125 S.Ct. 2240, 2242

(2005) (Mem.) (vacating and remanding case in light of *Cronic* when ineffective assistance

limited to counsel's failure to address biased nature of jury); *United States v. Thomas*, 417 F.3d

1053, 1055 (9th Cir. 2002) (declining to presume prejudice where defense counsel conceded guilt

on criminal charge without consulting defendant or obtaining his consent);  *United States v.*

*Baldwin*, 987 F.2d 1432, 1437-38 (9th Cir. 1993) (declining to apply presumption where counsel

conceded defendant's guilt in pretrial conference, used profanity before the jury, and failed to

request an overt act instruction); *Trevino v. Evans*, 521 F.Supp.2d 1104, 1119 (S.D.Cal. 2007)

(declining to apply presumption of prejudice where counsel had only 30 days to prepare for trial

after his substitution); *Anaya v. Hickman*, 111 Fed.Appx. 491, 492 (9th Cir. 2004) (refusing to

assume prejudice under *Cronic* since counsel's error, failing to seek trial bifurcation in a

California three strikes case, was "plainly of the same ilk as other specific attorney errors [the

Supreme Court has] held subject to *Strickland's* performance and prejudice components").

  In *Cronic* itself, the Supreme Court did not presume prejudice and "reversed a Court of

Appeals ruling that ranked as prejudicially inadequate the performance of an inexperienced,

underprepared attorney in a complex mail fraud case." *Florida v. Nixon*, 543 U.S. 175, 190

(2004).  In *Nixon*, the Court declined to presume prejudice in counsel's strategic decision, in the

face of almost certain conviction and carried out without Nixon's explicit consent, to concede

Nixon's guilt in a capital murder case and to concentrate on sparing Nixon's life in the penalty

phase. *Id.* at 178.

  Petitioner presented no evidence to support a conclusion that Hove's representation

entirely failed to subject the prosecution's case against her to meaningful adversarial testing.  The

state court reasonably rejected this claim.

**VII.**  **Failure to Disclose Victim's Visual and Medical Impairments**

  Petitioner contends that the prosecution failed to disclose written reports of the

46

1   Tuolumne County Probation Department concerning Dorrey Hite's visual and medical

2   impairments, violating Petitioner's right to due process under the Fifth and Fourteenth

3   Amendments.  According to Petitioner, "Hite's vision was impaired so severely that she was

4   legally blind."  Doc. 22-1 at 107.

5          **A.   Trial Testimony**

6          In its opening statement at trial, the defense claimed that Petitioner did not use a gun in

7   the course of her confrontation with Dorrey Hite and that only Hite claimed to have seen a gun.

8   The defense also contended that Hite had stolen money and checks from Petitioner's purse and

9   had a motive to lie.  *Id.* at 21.

10         Hite testified that she was awakened at about 2:30 a.m. on November 18, 2001, by

11  banging on her neighbor's door.[5]  She remained in bed until she heard someone calling her name.

12  After turning on "a tiny little lamp" next to her bed, Hite opened her front door a crack and saw a

13  woman and a blond man (later identified as Kevin Wallen) leave her neighbor's door and start up

14  her steps.  Hite did not know the man but recognized Petitioner, who was carrying a gun, when

15  she was about five-to-six feet away at the bottom of the steps.[6]  When she attempted to shut her

16  door, Hite was nearly knocked off her feet when Petitioner or Wallen kicked the door open.  As

17  she advanced into Hite's apartment, Petitioner swung the gun at Hite's head and yelled that Hite

18  had gone to the home of Petitioner's drug connection:

19              And I said, "So what?  You're the one that got burnt, not me."

20              And she—the guy—then the guy says, "Well, I thought this had to
                do with money."
21
                And I said, "What?  She spent a whole $5."
22
                And she said, "No, I spent 20."
23
                And he said, "$20?" And he got mad and tried to take the gun from
24              her.

25              Reporter's Transcript (February 27, 2003).[7]

26  _____

    [5] Hite and her neighbor shared a single set of steps with a railing up the middle.
    [6] According to Hite's testimony, she had travelled to Modesto with Petitioner several months earlier to buy drugs.
27  Petitioner had been cheated by a third party and blamed Hite, to whom she had advanced money for the transaction.
    Hite had later returned alone to buy drugs from the same individual.
28  [7] The Reporter's Transcripts are not paginated.

                                            47

1    Meanwhile, Petitioner was swinging the gun, "a big revolver," in Hite's face, threatening

2    to shoot Hite.  Hite recalled that Petitioner yelled, "I'm going to shoot you," at least three times.

3    Petitioner was angry and smelled of alcohol.  Wallen repeatedly asked Petitioner to give him the

4    gun.

5    Frightened, Hite ran out the back door of her apartment and yelled to her neighbor, John

6    Castro,[8] to call the police because Petitioner had a gun.  Standing on Castro's back porch, Hite

7    heard Petitioner say, "You're damn right I got one," but Hite no longer saw the gun in her hand.

8    Hite then struck out at Petitioner.  Castro broke up the fight and told Petitioner to leave.

9    Petitioner left through Hite's apartment, stealing her cell phone on the way.  Hite did not see

10   Wallen after she fled the apartment.

11   Castro testified that Hite repeatedly exclaimed that Petitioner had a gun but he did not

12   personally see it.  He also testified that Wallen was present in the backyard when Hite and

13   Petitioner fought.

14   Castro testified that Petitioner told him that she "should have had a gun."  He denied

15   having told officers that Petitioner said, "You bet I have a gun," as noted in a report prepared by

16   Sheriff's Deputy Neil Evans.  Testifying later in trial, Evans confirmed that when interviewed on

17   the scene, Castro told Evans that Petitioner said, "You bet I have a gun."

18   Castro's house guest, Vickie Paul, accompanied Petitioner as she left through Hite's

19   apartment.  Paul testified that Wallen met Petitioner at the front door and encouraged her to leave.

20   When Hite returned to her apartment after spending a few minutes speaking to the

21   sheriff's dispatcher from Castro's phone, her front door was open, and her cell phone was

22   missing.  As Hite began to lock the front screen door, she saw Petitioner approaching with a buck

23   knife, which she dropped when Hite pointed out that the police were arriving behind her.  Police

24   later recovered the knife, bearing the initials "K.W.," from the ground outside Hite's apartment.

25   When Corporal Jerry McCaig arrived at the scene, Petitioner approached his patrol car

26   and immediately stated, "There's two sides to every story and I didn't have a gun."  Wallen left

27

28   [8] Hite and Castro subsequently had a falling out after Hite accused Castro of having burglarized her apartment at
     some point after the incident.  In their respective testimony, each spoke of the other with undisguised hostility.

his vehicle and said, "There's no gun." But when McCaig asked Hite separately, she described having been threatened with a black revolver. Before police discovered the gun in Wallen's Bronco, Narcotics Sergeant James Mele showed Hite a document picturing various types of guns. Hite identified a revolver of the type that was later recovered from Wallen's vehicle.

McCaig searched Wallen's vehicle and found the gun in a locked case in the back seat.[9] He also recovered Hite's cell phone, which Hite recognized from ten feet away as police removed it from the Bronco. After Petitioner claimed the phone was hers, Hite produced the rental contract to prove ownership.

Evans, the last officer to arrive at the scene, spoke to Petitioner while she was seated in the back of a patrol car. Petitioner told him that she had taken the cell phone to compensate her for money and checks that Hite had stolen from her.

In the course of cross-examination, Hite emphasized that she had clearly been able to see both Petitioner and the revolver that she carried since Petitioner had been very close to Hite during the confrontation inside Hite's front door. Hite also acknowledged that on November 18, 2001, she was recovering from heroin addiction; however, the trial judge sustained the prosecution's objection that detailed questions about the nature and extent of Hite's addiction lacked relevance.

## B.    Evidence Presented in Postconviction Proceedings

Plaintiff contends the probation records relevant to the eyesight of witness Dorrey Hite were suppressed. The allegedly suppressed probation report is not included in the record. According to the return to petition for writ of habeas corpus, Hite's probation file notes that she verbally told her probation officer: "Eyesight continues to worsen." "Have eyeglasses on the way—should be here by end of 12/01." Doc. 22-2 at 12. The record discloses nothing more. Notably, Petitioner does not contend that the probation file itself states that Petitioner was legally blind or sets forth any information regarding Petitioner's medical history.

The record includes Hite's optometric and medical records for an extended time period.[10]

---

[9] The key to the gun case was on the key ring in the ignition of Wallen's vehicle.

[10] Hite signed documents authorizing the release of her medical records to petitioner's counsel.

1   Only those records close in time to the November 18, 2001, incident are relevant.

2   　　　Notes from Hite's October 2001 eye examination are included in the record as Doc. 10-2

3   at 46-47.  Hite told the examining doctor, Dr. Ardron, that her near and distance vision had

4   recently diminished.  With her glasses on, she experienced blurry vision, glare from lights, double

5   vision, trouble reading, trouble reading road signs, and wandering eyes.  Her history included lazy

6   eye and crossed eyes.  The examination revealed 20/50 uncorrected vision and 20/30 corrected

7   vision.  Dr. Ardron noted intermittent double vision and prescribed new lenses.

8   　　　Hite's October 11, 2001, examination at the primary care clinic of Tuolumne Medical

9   Center appears at Doc. 10-3 at 70-72.  After recent detox treatment, Hite was not taking street

10  drugs: she sought to resume treatment of her thyroid problems, which she had discontinued while

11  taking illicit drugs.  Hite sought referral to a different neurologist because the assigned doctor had

12  not been helpful.  She was experiencing headaches that were not responsive to ibuprofen.  Her

13  anti-depressive medication was working well. She also requested an antibiotic for a dental

14  abscess while she sought dental care.  Nurse-practitioner Carol Wiley ordered thyroid testing,

15  prescribed penicillin and Vicodin, and noted that the clinic needed to find another neurologist to

16  treat Hite.

17  　　　On November 28, 2001, Hite was hospitalized for a three-week-old subcutaneous hip

18  abscess caused by skin popping heroin.  Nursing staff noted that the exophthalmos (bulging) of

19  Hite's left eye was so severe that it remained open while she slept.  Petitioner wore glasses;

20  hospital records (physical therapy screening) note normal functional ability and normal visual

21  function.

22  　　　Petitioner's expert ophthalmologist, Murad Sunalp, M.D., reviewed Hite's medical

23  records from Donaldson Eye Care Associates (April 2000-May 2003) and Family Health &

24  Wellness Clinic (April 1999-May 2003); the government's statement of facts in Petitioner's direct

25  appeal; and information secured from the Tuolumne County Probation Department by Petitioner's

26  counsel.  In a declaration dated January 5, 2005, Sunalp opined that on November 18, 2001,

27  Hite's vision was seriously impaired, dropping as low as 20/200 in conditions of poor lighting.

28  Drooping of her right eyelid resulting from myasthenia gravis may have rendered her without

functional vision in her right eye.  Hite's vision was also compromised by Graves disease.

Finally, Hite took multiple prescriptions that can cause visual and physiologic ocular errors and

misinterpretation of visual experience.

Benjamin Kaufman, M.D., a psychiatrist and neurologist whom Petitioner also hired as an

expert, reviewed Hite's medical records from Donaldson Eye Care Associates (April 2000-May

2003) and Family Health & Wellness Clinic (April 1999-May 2003); the government's statement

of facts in Petitioner's direct appeal; information secured from the Tuolumne County Probation

Department by Petitioner's counsel; and Dr. Sunalp's opinion letter.  In a declaration dated

January 6, 2005, he opined that Hite's physical condition, prescription medications, and visual

impairment, combined with her use of heroin and methamphetamine, significantly affected her

ability to perceive the events that were the subject of her trial testimony.

In an opinion letter dated February 24, 2005, Petitioner's expert psychologist Deborah

Davis opined that Hite's medical condition, visual difficulties, and legal and illegal drug use put

Hite at increased risk of misperception of nonthreatening objects as weapons.  She added:

> It is also likely that a person confronted by persons aggressively
> invading her home and engaging in a hostile confrontation might
> fear or expect that one or more of them might wield a weapon.  Her
> fear and expectation could easily lead her to misperceive a weapon
> where none existed, particularly if the hand or object was rendered
> blurry by her vision difficulties.

Doc. 7 at 108.

Davis reviewed the declarations of appellate counsel James B. Andres, Dr. Sunalp, and Dr.

Kaufman; the government's statement of facts in Petitioner's direct appeal; information secured

from the Tuolumne County Probation Department by Petitioner's counsel; and Hite's trial

testimony.

In a declaration dated September 18, 2006, Petitioner's expert opthalmologist John Davis

Edmiston II, M.D., opined that due to uncorrected farsightedness and presbyopia, Hite's vision

was significantly impaired on November 18, 2001.  He opined that the circumstances of the

interaction and the unique characteristics of the two locations in which Hite had the opportunity

to observe and identify a handgun in Petitioner's possession made it extremely unlikely that Hite

1   could have accurately perceived and identified a handgun.  Hite's vision would have rendered any

2   object held three feet from her eyes blurry, indistinct, and virtually unrecognizable.  The effect

3   would have been aggravated by Hite's double vision and the fact that she had just awakened from

4   sleep.

5          In a declaration dated September 29, 2006, that was prepared by Petitioner's counsel, Hite

6   reported  that she had an eye examination at Donaldson Eye Care Associates on October 26,

7   2001.  In early December 2001, she prepared a written report to Tuolumne County Probation in

8   which she "mentioned that my eye sight was worsening and that I anticipated getting new glasses

9   before the end of December, 2001."  Doc. 9-1 at 60.

10         On October 19, 2005, Dr. Kaufman prepared a second declaration in which he objected to

11  the Attorney General's characterizing his opinion as "speculation" in its informal response to the

12  December 2005 petition for writ of habeas corpus.  Kaufman acknowledged that he had never

13  examined Hite and had no personal knowledge of "the actual lighting conditions and other

14  circumstances, which may have affected Hite's vision."  Doc. 9-1 at 63.  He nonetheless

15  reasserted his opinion that Hite's medical records formed a sufficient basis for his opinion.

16          In a declaration dated January 7, 2010, and prepared at Respondent's request, Hite stated,

17  "At the time of the incident, I had no difficulty seeing [Petitioner].  At the time of trial, I had no

18  difficulty seeing her.  I identified her in court."  Doc. 22-2 at 32.  Although myasthenia gravis

19  occasionally caused double vision, Hite had no difficulty seeing Petitioner on November 18,

20  2001: "She was right in my face.  I was easily able to recognize her at that time.  I did not feel at

21  the time of the incident that my vision was impaired."  Doc. 22-2 at 33.

22         Hite reported that Petitioner knew that Hite wore glasses; she had worn glasses when she

23  travelled to Modesto with Petitioner and also at trial.  She had no difficulty seeing Petitioner in

24  the courtroom.  Although Hite briefly lost her driver's license in the 1990's for failure to have

25  adequate insurance in an accident, she had no difficulty regaining her license in 2003.  Her vision

26  had never prevented her getting a driver's license.

27         Hite never provided a written report to the probation department regarding her vision,

28  health, or any other issue.  To the extent that she disclosed any health information to her

1  probation officer, she did so verbally and in person in the course of meeting with her probation

2  treatment team.

3       In a declaration dated February 5, 2010, Michael Knowles, the assistant district attorney

4  who prosecuted the case against Petitioner, stated that at the time of trial, he had no knowledge

5  that Hite had any visual problems.[11]  Knowles and Hite never discussed her vision nor did Hite

6  offer any unilateral disclosure of medical or vision problems.  Knowles added that during a

7  meeting in his office, Hite had no difficulty reading the certificates and diplomas on his wall, as

8  indicated by her spontaneously questioning him about the Order of the Coif.

9       **C.  State Court Opinions**

10       In its remand decision dated May 20, 2010, the Tuolumne County Superior Court

11  resolved this issue factually:

12
13
14  > Petitioner claims the prosecution suppressed exculpatory evidence
> regarding the credibility of a witness.  Witness Dorrey Hite made
> several statements regarding her deteriorating eyesight in
> confidential reports she made to her probation officer while she was
> a participant in Drug Court.  The witness had previously been
> convicted of a drug offense in November 1998, and was on
> probation.  Petitioner contends that the information in the
> statements the witness made to her probation officer was
> information available to the prosecution.  Petitioner contends that
> the probation department is part of the prosecution team.  She
> contends that the prosecution committed a *Brady* error in not
> making the information available to her.  Petitioner further contends
> that the deputy district attorney who prosecuted the case had not
> only constructive knowledge of that information, but actual
> knowledge as well, as he made appearances for the District
> Attorney in the witness's criminal proceedings.

15
16
17
18
19
20
21  > Respondent has provided a declaration to this Court from the
> prosecuting attorney in Petitioner's underlying criminal case stating
> that while he had met with the witness Dorrey Hite prior to trial, he
> was not aware of any vision problems that she may or may not have
> had.  He further states that he was unaware that her vision was an
> issue in any way until the Petition for Writ of Habeas Corpus was
> served on the District Attorney's Office.

22
23
24
25  > The prosecution would have received the report prepared by the

26  _____
[11] Petitioner contends that Knowles had to have knowledge of Hite's probation statement because he appeared in
court nine times in the course of Hite's trial and conviction on a 1997 drug charge and her subsequent violations of
probation.  The record indicates that Knowles appeared in proceedings up to and including Hite's 2000 transfer to
Drug Court supervision.  Knowles did not appear in Drug Court, where proceedings regarding Hite were handled by
her treatment team.  Hite made the statement regarding her visual problems and anticipated receipt of new glasses in
December 2001, well after Knowles' involvement in her case.

27
28

probation department for Dorrey Hite's sentencing hearing. That report, reviewed by this Court for this proceeding, contains no information regarding her medical condition generally, and specifically contained no information regarding her vision. There is nothing in the probation report that the prosecution had in its possession that would indicate the witness's credibility was at issue due to deteriorating eyesight.

Additionally, a review of the Court's file for Dorrey Hite's criminal proceedings shows that there is no documentation that her medical condition was mentioned at any of the hearings in the criminal proceedings leading to conviction. Post-conviction, Ms. Hite was referred and accepted into Drug Court after a violation of probation. The statements she made to her probation officer regarding her eyesight were made while she was a participant in Drug Court. Her probation officer would have been part of the Drug Court treatment team.

Petitioner has argued that because the probation department is part of the prosecution team, the information in its records can be imputed to the District Attorney's office. The position that a probation department is part of a prosecution team is contrary to law. It is long established that a county probation department is an arm of the Superior Court. (*People v. Villareal* (1977) 65 Cal.App.3d 938, 945, citing *In re Giannini* (1912) 18 Cal.App. 166, 169.) The probation department is not a police agency, and the information in its records cannot be imputed to the prosecution.

Doc. 29 at 57-58.

The state court distinguished *In re Pratt* (69 Cal.App.4[th] 1294 (1999)), on which Petitioner had relied. The prosecution in *Pratt* had actual possession of the probationary report, unlike the prosecution in Petitioner's case. The state court found that the record did not support Petitioner's claim that the prosecution had actual knowledge of Hite's vision and medical condition but suppressed it.

In any event, the court disagreed with Petitioner's contention that information concerning Hite's vision and medical condition was material:

Petitioner previously provided the Court a declaration from her trial counsel regarding the reports made by Dorrey Hite to her probation officer while she was a participant in drug court. He states that he had no knowledge prior to trial that the witness suffered from vision impairment. He further states he would have used the information of impaired vision on cross-examination to discredit the witness's capacity to perceive the events about which she testified at trial. He opines that this information is especially important because the witness was the only person who testified at trial that she observed petitioner in possession of a handgun.

> While counsel has stated what he could have done with the information about her impaired vision, this does [not] equate to a showing that having this information prior to trial would have yielded a different result.

Doc. 29 at 59.

Finding reports of Hite's vision after trial to be irrelevant to the state of her vision on the date of the crime, the superior court rejected Dr. Edmiston's opinion as unsupported by records of Hite's visual care before the trial.  The court also rejected Hite's attempts to cooperate with Petitioner's counsel and the prosecution,[12] emphasizing that "she has not recanted her testimony that she saw Petitioner with a handgun."  Doc. 29 at 59-60.

As was the case with the ineffective assistance of counsel claim, the Court of Appeals rejected Petitioner's claim that its order to show cause remanding the issue to the superior court constituted binding factual and legal determinations.  Addressing the new petition before it, the Court of Appeals wrote:

> The information possessed by the probation department was too conclusional to constitute favorable or material evidence regarding the ability of victim Dorrey Hite . . . to perceive a gun in petitioner's hand on the night of the offense under the lighting conditions in the victim's apartment.  (*In re Sassounian* (1995) 9 Cal.4th 535.)

> Assuming that the information from the Donaldson Eye Care Center (Center), the Family Health and Wellness Clinic (Clinic), and the expert declarations which petitioner was able to develop from the probation department information may be considered evidence suppressed by the prosecution, that information was also conclusional in critical aspects.  The reports from the Center and Clinic did not provide sufficient details about the condition of the victim's eyesight on the night of the offense nor the dosages and frequency of her taking medications.  Petitioner's experts did not personally examine the victim nor have sufficient details regarding the lighting conditions in the victim's apartment.  The meager information that the apartment was illuminated by a "tiny" lamp does not describe the actual size of the lamp, the voltage of the bulb or bulbs nor the lamp's placement and distance relative to the positions of the victim and petitioner.  The experts also did not have information regarding the extent to which the victim took medications on the night of the offense. The limited information available to the experts and their failure to provide adequate

---

[12] Beginning at Petitioner's sentencing when she provided a statement that Petitioner's offense was not so serious as to require enhanced sentencing, Hite cooperated with defense requests for her assistance in opposing Petitioner's sentence under the three strikes law.  Nonetheless, Hite has always maintained that Petitioner threatened her with a revolver on November 18, 2001.

"explanation[s]" regarding how they derived their opinions from the incomplete, partly conclusional and meager information available to them rendered their opinions insufficient under *In re Sassounian*, *supra*, 9 Cal.4[th] 535."

Doc. 29 at 65-66.

### D.      **Prosecutor's Duty to Disclose**

#### 1.      **In General**

"[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87.  The Supreme Court has also held that failure to disclose material and favorable evidence violates due process even if the defendant did not request the evidence. *See United States v. Bagley*, 473 U.S. 667, 675 (1985); *United States v. Agurs*, 427 U.S. 97, 110 (1976).

"To establish that a *Brady* violation undermines a conviction, a convicted defendant must make each of three showings: (1) the evidence at issue is 'favorable to the accused, either because it is exculpatory, or because it is impeaching"; (2) the State suppressed the evidence, "either willfully or inadvertently"; and (3) "prejudice . . . ensued." *Skinner v. Switzer*, 562 U.S. 521, 536 (2011) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999)).  In *Sassounian*, on which the Court of Appeals relied, the California Supreme Court applied these federal constitutional principles and concluded that the petitioner failed to carry his burden of proving that the evidence allegedly withheld by the prosecution was favorable and material, as required by *Bagley* (473 U.S. at 674).  *Sassounian*, 9 Cal.4[th] at 543-44.

#### 2.      **Favorable Evidence**

"Evidence is 'favorable' if it either helps the defendant or hurts the prosecution, as by impeaching one of its witnesses." *Sassounian*, 9 Cal.4[th] at 544 (citing *Bagley*, 473 U.S. at 676). Hite's statements to her probation officer that her vision had deteriorated and that she expected to receive her new glasses by the end of the year qualify as favorable evidence since they could be used to impeach Hite's testimony about what she saw in the course of the November 18, 2001, incident that lead to the charges against Petitioner.

### 3. **Suppression**

"The prosecution's duty to divulge relevant information is a 'broad obligation.'" *Amado v. Gonzalez*, 758 F.3d 1119, 1134 (9th Cir. 2014) (quoting *Strickler*, 527 U.S. at 281). Under *Bagley*, "the prosecution must disclose all impeachment evidence," including impeachment evidence that is not in the prosecutor's possession. *Amado*, 758 F.3d at 1134. "The prosecution's duty to reveal favorable, material information extends to information that is not in the possession of the individual prosecutor trying the case." *Amado*, 758 F.3d at 1134. "[B]ecause the prosecution is in a unique position to obtain information known to other agents of the government, it may not be excused from disclosing what it does not know but could have learned." *Id.* "If the suppression of evidence results in a constitutional error, it is because of the character of the evidence, not the character of the prosecutor." *Agurs*, 427 U.S. at 110. For purposes of this habeas petition, the Court will assume the prosecutor's failure to disclose Hite's comments to her probation officer, even though the probation department is not part of the prosecution team and the prosecutor did not know of the report, arguably constituted suppression.[13]

### 4. **Material Evidence (Prejudice)**

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995); *Sassounian*, 9 Cal.4th at 544 (quoting *Bagley*, 473 U.S. at 682). "A 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles*, 514 U.S. at 434. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* In addition, the probability must be "objective," that is, "based on 'an assumption that the decision maker is reasonably,

---

[13] Petitioner attempts to characterize the prosecutor's failure to disclose the probation report, of which he was unaware at the time of trial, as also constituting an error under *Napue*. See *Napue*, 360 U.S. at 269 (The prosecutor has a constitutional duty to correct false testimony.) The Court summarily rejects this imaginative attempt to equate failure to disclose material unknown to the prosecutor with the constitutionally required disclosure of known material for impeachment purposes.

1   conscientiously, and impartially applying the standards that govern the decision,' and not

2   dependent on the 'idiosyncracies of the particular decisionmaker,' including the 'possibility of

3   arbitrariness, whimsy, caprice, nullification, and the like.'"  *Sassounian*, 9 Cal. 4th at 545 (quoting

4   *Strickland*, 466 U.S. at 695).

5        A court must evaluate materiality in the context of the record as a whole.  *Agurs*, 427 U.S.

6   at 112.  In addition, it must evaluate the undisclosed evidence collectively, not item by item.

7   *Kyles*, 514 U.S. at 436.  The California courts did so here, rejecting the expert opinions that

8   Petitioner presented to buttress her claim as conclusional and drawn from portions of Hite's

9   medical records relating to her condition after, or well before, November 18, 2001.

10       The Superior Court's analysis and rejection of Petitioner's supporting materials are well

11   supported by the record.  Dr. Sunalp's references to Hite's drooping right eyelid and Grave's

12   disease do not find support in the records of medical or optical examinations in fall and early

13   winter 2001.  His statement that Hite's vision dropped to 20/200 in poor light had no apparent

14   basis.  Dr. Kaufman's opinion failed to explain the basis of his conclusions and assumed an effect

15   from heroin and methamphetamine despite the absence of any evidence of Hite's taking either

16   drug at the time of the incident.  Davis's speculative opinion that Hite likely misperceived some

17   other object as a gun only has no specific basis in the facts of the underlying incident, it is

18   inconsistent with Hite's ability to identify specifically the type of gun that she saw and the

19   discovery of that type of gun in the subsequent search of Wallen's Bronco outside of the

20   apartment.  Edmiston's assumption of uncorrected presbyopia and farsightedness at the time of

21   the incident has no evidentiary basis.

22       In considering Petitioner's supportive evidence, one must not lose sight of the fact that the

23   expert opinions and declarations post-conviction were submitted only to buttress Petitioner's

24   claim that the prosecutor failed to disclose two very general statements that Hite made to her

25   probation officer concerning her need for new glasses, which she expected to receive shortly.

26   That those who wear corrective lenses require periodic check-ups and adjustments of their

27   prescriptions is common knowledge, and both Petitioner and her counsel knew that Hite wore

28   glasses.  In fact, Petitioner's trial counsel cross-examined Hite regarding her ability to see

1   Petitioner on November 18, 2001.

2       In the Ninth Circuit, "[a] defendant is entitled to material in a probation file that bears on

3   the credibility of a significant witness in the case." *United States v. Strifler*, 851 F.2d 1197, 1201

4   (9th Cir. 1988).   Contrary to petitioner's assertion (Doc. 22-1 at 108, ¶ 4), however, the Ninth

5   Circuit does not require "reversal for non-disclosure where undisclosed *Brady* material in

6   probation file pertained to prosecution witness's credibility."   In *Strifler*, the circuit court

7   contemplated that the prosecution would produce a significant witness's probation records to the

8   trial judge for *in camera* review.  851 F.2d at 1201.  Following review, the judge should release

9   only the specific information relevant to the defendant's concerns under *Brady*, not the probation

10  reports as a whole.  *Id.*  The court explained:

11          The ruling of the court is a ruling on evidence.  The trial court must
            release what it finds relevant, material, and probative as to the
12          witness['s] credibility.  *See Giglio v. United States*, 405 U.S. 150,
            154 . . . (1972).  It need not release evidence that is not material.
13          *Cf. United States v. Bagley*, 473 U.S. 667, 682 . . . (1985).
            Evidence that is merely cumulative is not credible.
14
            We adopt the rule that we will reverse for denial of *Brady* material
15          from a probation file if, on review of the file, we find that the
            district [trial] court committed clear error in failing to release
16          probative, relevant, material information.

17          *Strifler*, 851 F.2d at 1202.

18  In this case, Petitioner contacted the probation department directly and directly obtained Hite's

19  medical records from the providers with her consent.  Accordingly, the *Strifler* holding does not

20  mandate reversal here.

21      In addition, U.S. Supreme Court precedent is contrary to Petitioner's claim that this Court

22  must reverse without further analysis.  Federal courts do not  "automatically require a new trial

23  whenever a combing of the prosecutor's files after the trial has disclosed evidence possibly useful

24  to the defense but not likely to have changed the verdict."  *Giglio v. United States*, 405 U.S. 150,

25  154 (1972).  "[S]trictly speaking, there is never a real '*Brady* violation' unless the nondisclosure

26  was so serious that there is a reasonable probability that the suppressed evidence would have

27  produced a different verdict."  *Strickler,* 527 U.S. at 278.  "[T]he materiality inquiry is not just a

28  matter of determining whether, after discounting the inculpatory evidence in light of the

59

1   undisclosed evidence the remaining evidence is sufficient to support the jury's conclusions." *Id.*

2   at 290.  Instead, the reviewing court must determine whether "the favorable evidence could

3   reasonably be taken to put the whole case in such a different light as to undermine the confidence

4   in the verdict." *Kyles*, 514 U.S. at 435.

5          The California court reasonably determined that the prosecution's failure to disclose

6   Hite's comment of her need for new glasses did not so alter the case as to undermine confidence

7   in the verdict.  The jury knew of other factors potentially affecting Hite's credibility, including

8   her criminal record, her prior heroin addiction, and her admitted continued occasional use of

9   heroin at the time of the incident.  Petitioner's identity was never in question. The only element of

10  her conviction that Petitioner challenges in the petition before this Court is her possession of the

11  gun.

12         Despite the nondisclosure of the evidence that Hite told her probation officer that her

13  vision had deteriorated and she expected to receive new glasses, the prosecution produced reliable

14  evidence sufficient for the jury to conclude that Petitioner had a gun.  Questioned about her

15  ability to see Petitioner and the gun, Hite denied any difficulty, explaining that Petitioner stood

16  very close to Hite and waved the revolver in Hite's face.

17         Even if Hite could not have clearly seen the gun, she testified that Petitioner repeatedly

18  stated that she was going to shoot Hite.  According to Hite's testimony, when Wallen heard the

19  small sum ($20.00) that Petitioner claimed Hite caused her to lose, he expressed disbelief and

20  attempted to disarm Petitioner.  Hite took advantage of the break in the action to escape out her

21  back door and run to Castro's apartment, yelling to him to call the police because Petitioner had a

22  gun.

23         According to Hite, when Hite exclaimed that Petitioner had a gun, Petitioner confirmed,

24  "You're damn right I got one."  In a statement to Deputy Evans at the scene, Castro also claimed

25  to have heard Petitioner respond, "You're damn right I got one."  On the stand at trial, however,

26  Castro denied that statement and claimed that Petitioner told him that she "should have had a

27  gun."  Deputy Evans testified that when interviewed on the scene, Castro told Evans that

28  Petitioner said, "You bet I have a gun."  Despite the contradictory testimony, the jury could

reasonably have credited the testimony that Petitioner acknowledged her gun possession.

Wallen's location after Hite fled the apartment was also disputed in the trial testimony. But the jury could reasonably have credited Vickie Paul's testimony that Wallen met Petitioner at the front door as she left Hite's apartment and urged her to leave.  Assuming that it did so, the jury could also have concluded that Wallen had sufficient time to return the revolver to its case in his Bronco, locking it with the key on his key ring.

Finally, Petitioner, buttressed by Davis's conclusory declaration, argues that Hite only saw an object that she thought was a gun.  When sheriff's officers arrived at the scene, Petitioner and Wallen spontaneously declared to responding officers that neither of them had a gun. Questioned separately before officers searched Wallen's Bronco, Hite described the gun to Corporal McCaig as a revolver and a "six-shooter."  She also identified the gun accurately on a chart displayed by Sergeant Mele. Later, the officers discovered a gun fitting Hite's description in a case in the back of Wallen's Bronco.

### 5.    Summary and Recommendation

When the evidence is evaluated as a whole,  Hite's telling her probation officer that she needed, and would soon receive, new glasses could not reasonably be seen "to put the whole case in such a different light as to undermine the confidence in the verdict" and so, "did not have the capacity to change fundamentally a reasonable probability that the suppressed evidence would have produced a different verdict."  The undersigned recommends that the Court conclude that the prosecution's failure to disclose the statement in Hite's probation records did not violate *Brady* because it was not material.

## VIII.   Certificate of Appealability

A petitioner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, but may only appeal in certain circumstances.  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides:

(a)  In a habeas corpus proceeding or a proceeding under section 2255

before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.

(b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.

(c)    (1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from—

(A)  the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a state court; or

(B)  the final order in a proceeding under section 2255.

(2)  A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3)  The certificate of appealability under paragraph (1) shall indicate which specific issues or issues satisfy the showing required by paragraph (2).

If a court denies a habeas petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El*, 537 U.S. at 327; *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Although the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." *Miller-El*, 537 U.S. at 338.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further.  Petitioner has not made the required substantial showing of the denial of a constitutional right.  Accordingly, the Court declines to issue a

certificate of appealability.

**IX.     Conclusion and Recommendation**

The undersigned RECOMMENDS that the Court deny with prejudice the petition for habeas corpus and decline to issue a certificate of appealability.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C § 636(b)(1).  Within **thirty (30) days** after being served with these Findings and Recommendations, either party may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections, if any, shall be served and filed within **fourteen (14) days** after service of the objections.  The parties are advised that failure to file objections within the specified time may constitute waiver of the right to appeal the District Court's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 ((9th Cir. 2014) (citing *Baxter v. Sullivan*, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:    __**January 4, 2016**__              ___/s/ *Barbara A. McAuliffe*___
                                                            UNITED STATES MAGISTRATE JUDGE